**Raymond J. DONOVAN, Secretary of Labor, United States Department of Labor, Plaintiff,**

v.

**TMC INDUSTRIES, LTD.; WWG Industries, Inc.; Commercial Affiliates, Inc.; and Chemical Bank of New York, Inc., Defendants.**

**Civ. A. No. C82–73R.**

United States District Court, N. D. Georgia, Rome Division.

May 25, 1982.

---

Bobbye D. Spears, Regional Sol., Dept. of Labor, Glenn M. Embree and A. B. Cuviello, Atlanta, Ga., for the Secretary of Labor.

Sidney J. Nurkin and Bruce B. Weddell, Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., for TMC, WWG, and CAI.

Ezra H. Cohen, Troutman, Sanders, Lockerman & Ashmore, Atlanta, Ga., for Chemical Bank.

## MEMORANDUM OF LAW

HAROLD L. MURPHY, District Judge.

The following is the memorandum of law in support of the Court's Order of March 17, 1982.

### I

TMC Industries, Ltd. (TMC) is a holding company whose assets include 80 percent of the stock of WWG Industries, Inc. (WWG). WWG is a manufacturer of carpet goods, doing business in Floyd and Gordon Counties, Georgia, and Hamilton County, Tennessee. Commercial Affiliates, Inc. (CAI), a wholly-owned subsidiary of TMC, is WWG's sales and distribution arm.

In February, 1982, Chemical Bank of New York (Chemical), WWG's primary source of credit since 1978, informed WWG that further funding of its operations was not forthcoming. The practical effect of this decision was to cause some WWG payroll checks not to be issued and others to be dishonored. On March 1, 1982, WWG filed a petition for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 301 and 1101 *et seq.* *In re WWG Industries, Inc.,* Case No. 82–00156R (Bkrtcy.N.D. Ga.). On March 11, 1982, the Bankruptcy Court approved debtor's application for authority to borrow additional money from

Chemical for interim operations in exchange for an additional security interest in favor of Chemical.

Contemporaneous with these events, the Secretary of Labor applied to this Court for an injunction to restrain defendants TMC, WWG and CAI from violating certain provisions of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.* On March 4, 1982, the Court denied the motion for a temporary restraining order because there was no showing that defendants intended to place the so-called "hot goods" in commerce.

On March 11, 1982, the Secretary filed an amended complaint and the Court heard evidence and argument of counsel on the motion for a preliminary injunction. In an Order issued March 12, 1982, the Court found that TMC, WWG and CAI constituted an enterprise within the meaning of §§ 3(r) and (s) of the FLSA. 29 U.S.C. §§ 203(r) and (s). Under authority of § 17 of the FLSA (29 U.S.C. § 217),[1] the Court

enjoined those defendants pursuant to § 15(a)(1) of the FLSA (29 U.S.C. § 215(a)(1))[2] from transporting, shipping or delivering any carpet produced by the employees of WWG who were employed in violation of §§ 6, 7, and 15(a)(2) of the FLSA (29 U.S.C. §§ 206, 207, and 215(a)(2)).[3]

The combined effect of the Order and bankruptcy proceedings was to cease all operations by WWG and CAI, except for some bookkeeping and inventory. There was no manufacturing or shipping of carpets, nor funds with which to compensate the WWG workers for regular and overtime work. The defendants, the Secretary, and counsel for the creditors' committee conferred, under the auspices of the Court, in an effort to iron out a settlement satisfactory to all concerned. When these talks failed, the Court entered an Order setting forth certain conditions which, if satisfied, would relieve the defendants from the con-

1. 29 U.S.C. § 217 provides:

The district courts, together with the United States District Court for the District of the Canal Zone, the District Court of the Virgin Islands, and the District Court of Guam shall have jurisdiction, for cause shown, to restrain violations of section 215 of this title, including in the case of violations of section 215(a)(2) of this title the restraint of any withholding of payment of minimum wages or overtime compensation found by the court to be due to employees under this chapter (except sums which employees are barred from recovering, at the time of the commencement of the action to restrain the violations, by virtue of the provisions of section 255 of this title).

2. 29 U.S.C. § 215(a)(1) provides:

(a) After the expiration of one hundred and twenty days from June 25, 1938, it shall be unlawful for any person—

(1) to transport, offer for transportation, ship, deliver, or sell in commerce, or to ship, deliver, or sell with knowledge that shipment or delivery or sale thereof in commerce is intended, any goods in the production of which any employee was employed in violation of section 206 or section 207 of this title, or in violation of any regulation or order of the Administrator issued under section 214 of this title;

3. 29 U.S.C. § 206 provides in part:

(a) Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for

commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following rates:

(1) not less than $2.65 an hour during the year beginning January 1, 1978, not less than $2.90 an hour during the year beginning January 1, 1979, not less than $3.10 an hour during the year beginning January 1, 1980, and not less than $3.35 an hour after December 31, 1980, except as otherwise provided in this section;

29 U.S.C. § 207 provides in part:

(a)(1) Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed; and

29 U.S.C. § 215(a)(2) provides:

(a) After the expiration of one hundred and twenty days from June 25, 1938, it shall be unlawful for any person—

(2) to violate any of the provisions of section 206 or section 207 of this title, or any of the provisions of any regulation or order of the Administrator issued under section 214 of this title.

straints of the injunction and allow them to resume operations. Part of that Order, delineating those conditions, is set out in the Appendix.

Defendants' basic contention is that the initiation of bankruptcy proceedings prevented this Court from exercising authority to enjoin defendants' shipping of goods. They argue that prohibiting the "hot goods" from entering commerce is tantamount to requiring the payment of back wages and overtime compensation, as those payments to the employees would present the only way to have the injunction lifted. And that course would disrupt the priority scheme of the Bankruptcy Code. Accordingly, the automatic stay prescribed by 11 U.S.C. § 362(a)(1) applies.

The Secretary contends that this is not an action to collect wages, but an action to prevent the tainted goods from entering the "channels of competition." The Secretary asks the Court to issue the injunction pursuant to the police and regulatory exception to the automatic stay. 11 U.S.C. § 362(b)(4).

The Fair Labor Standards Act was originally enacted in 1938 as the cornerstone of President Roosevelt's effort to protect labor from substandard working conditions. The principal features of the Act establish minimum wages (§ 206) and maximum hours (§ 207), and prohibit oppressive child labor (§ 212). The Act prohibits the shipment or sale of any goods in the production of which any employee was employed in violation of § 206 or § 207 (§ 215(a)(1)). This Section also prohibits the violation of the minimum wage and maximum hour provisions (§ 215(a)(2)). The enforcement scheme is found in § 216 and § 217 of the Act. First, there is criminal exposure for violating § 215 (§ 216(a)). Second, an action may be brought by individual employees to receive unpaid wages or overtime compensation (§ 216(b)), or by the Secretary on behalf of employees (§ 216(c)). An action brought under § 216(b) or (c) is a damage action. Third, the Secretary may bring an action for injunctive relief (§ 217). The Secretary may seek to enjoin any activity proscribed

by § 215: that is, the sale or transport of goods manufactured by individuals who were not legally compensated (§ 215(a)(1)), or to restrain the withholding of unpaid wages or overtime compensation (§ 215(a)(2)).

It bears repeating: this is an action brought under § 217 of the Act to enforce § 215(a)(1). It is not an action for damages under § 216(c); it is not an injunctive action under § 217 to restrain the withholding of unpaid wages in violation of § 215(a)(2). The Secretary only seeks a Court order enjoining the violation of § 215(a)(1), the sale or transportation of goods in the production of which employees were employed in violation of §§ 206 or 207.

▆ An injunction under § 217 is "not to collect a debt but rather to redress a wrong being done to the public good." *Wirtz v. Jones*, 340 F.2d 901, 903–04 (5th Cir. 1965); *Donovan v. University of Texas at El Paso*, 643 F.2d 1201, 1208 (5th Cir. 1981). Even aside from this conceptual underpinning of all § 217 actions, this case does not even resemble an action to collect a debt: the complaint does not seek the recovery of any money.

The issue in this case can now be viewed in sharper focus. Employees of the debtor occupy a high echelon in the Bankruptcy Code. In a voluntary case, employees' claims are superior to all other claims except administrative expenses and certain fees and charges delineated in § 507(a)(1). 11 U.S.C. § 507(a)(3). Claims for wages, salaries or commissions are allowed to the extent of $2,000 per individual. Any claim in excess of $2,000 is a general claim on the same footing as unsecured creditors' claims. The Bankruptcy Code generally prohibits the exercise of jurisdiction over the affairs of a debtor in any Court except the Bankruptcy Court. One exception protects the public interest by permitting the government to enforce its police or regulatory power in the appropriate forum. The Fair Labor Standards Act authorizes the Secretary to seek an injunction in U. S. District Court to restrain the shipment of tainted

goods. The issue is whether this Court's exercise of jurisdiction over the FLSA suit is authorized by the (b)(4) exception to the automatic stay.

## II

■ The purpose of the automatic stay is to facilitate the orderly administration of the debtor's estate. It provides "a 'defensive' weapon in the limited arsenal of a debtor against the phalanx of creditor efforts." In re Purdy, 16 B.R. 860, 867 (N.D. Ga.1981).

> The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

S.Rep.95–989, 95th Cong., 2nd Sess. 55, reprinted in [1978] U.S.Code Cong. & Ad. News 5787, 5840–41.

■ The exception to the automatic stay reflects a concern for the efficacy of the state and federal government's police and regulatory power. Congress concluded that the government's interest in the enforcement of these laws outweighed the debtor's interest in disentangling himself from sundry creditors. Additionally, it would be anomalous to permit the debtor to use the stay to shield his activities which violate state and federal laws.

> The Bankruptcy Court is not a haven for wrongdoers and the policy of the Code is to permit regulatory, police and criminal actions to proceed in spite of § 362(a)(1) but to not permit a seizure of property without a bankruptcy Court order.

2 Collier ¶ 362.05[4] at 362–40 (15th ed. 1981). "[I]f the debtors' position were to be adopted, Chapter XI would provide an instantly available, cheap and easy sanctuary from all state regulatory enforcement proceedings and from all federal regulatory proceedings." In re Shippers Interstate Service, Inc., 618 F.2d 9, 13 (7th Cir. 1980) (NLRB enforcement). While the stay is designed to stabilize the status of the assets, the (b)(4) exception permits the government to enforce its laws uniformly without regard to the debtor's position in the bankruptcy court. The legislative history highlights the function of (b)(4):

> Paragraph (4) excepts commencement or continuation of actions and proceedings by governmental units to enforce police or regulatory powers. Thus, where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay.

S.Rep.95–989, 95th Cong., 2d Sess. 55, reprinted in [1978] U.S.Code Cong. & Ad. News, 5787, 5838; H.R.Rep.No.595, 95th Cong., 1st Sess. 343 reprinted in [1978] U.S. Code Cong. & Ad.News, 5963, 6299.

> Section 362(b)(4) indicates that the stay under section 362(a)(1) does not apply to affect the commencement or continuation of an action or proceeding by a governmental unit to enforce the governmental unit's police or regulatory power. This Section is intended to be given a narrow construction in order to permit governmental units to pursue actions to protect the public health and safety and not to apply to actions by a governmental unit to protect a pecuniary interest in property of the debtor or property of the estate.

Remarks of Rep. Don Edwards, 124 Cong. Rec. H11089 (1978), reprinted in [1978] U.S.Code Cong. & Ad.News, 6436, 6444–45; Remarks of Sen. Dennis DeConcini, 124 Cong.Rec. S17406 (1978), reprinted in [1978] U.S.Code Cong. & Ad.News, 6505, 6513.

## III

Recent cases which have explored the contours of the (b)(4) exception emphasize the distinction between the government acting in its own pecuniary interest (or the pecuniary interest of a favored creditor), and the government acting to enforce police and regulatory laws.

## A

Government authorities have been permitted to proceed with a variety of regulatory or police measures despite pendency of bankruptcy proceedings. *Commodity Futures Trading Commission v. Incomco, Inc.,* 649 F.2d 128 (2nd Cir. 1981) (requiring CFTC access to debtor's books and records on trading activity); *Securities and Exchange Commission v. First Financial Group of Texas,* 645 F.2d 429 (5th Cir. 1981) (S. E. C. obtaining injunction to enjoin debtor's offer of securities; receiver appointed); *Matter of Canarico Quarries, Inc.,* 466 F.Supp. 1333 (D.P.R.1979) (stay inapplicable to action investigating environmental protection law violations by debtor); *Matter of Alessi,* 12 B.R. 96 (Bkrtcy.N.D.Ill. 1981) (denying debtor's application for license to race horses not violation of automatic stay); *Colonial Tavern Inc. v. Byrne,* 420 F.Supp. 44 (D.Mass.1976) (suspending liquor license); *In re Cousins Restaurants, Inc.,* 11 B.R. 521 (Bkrtcy.W.D.N.Y.1981) (enforcing zoning ordinance requiring special permit for discos); *In re Mansfield Tire and Rubber Co.,* 660 F.2d 1108 (6th Cir. 1981) (permitting Ohio workmen's compensation proceedings to continue).

Proceedings concerning the employer-employee relation also have been held to come within the (b)(4) exception. *See In re D. M. Barber, Inc.,* 13 B.R. 962 (Bkrtcy.N.D.Tex. 1981). In *National Labor Relations Board v. Evans Plumbing Company,* 639 F.2d 291 (5th Cir. 1981), the Fifth Circuit granted the petition for enforcement of the Board's decision ordering the reinstatement of two employees with back pay who were discriminatorily discharged by the debtor. The court concluded that the Board's action was undertaken to enforce the federal law regulating the relationship between employer and employee, i.e., an exercise of police or regulatory power. While the question of whether the Board could *enforce* the back pay award was left unresolved, the *Evans* decision left no doubt about the authority under § 362(b)(4) to require employee reinstatement. *See also, In re Bel Air Chateau Hospital, Inc.,* 611 F.2d 1248 (9th Cir. 1979), and *Matter of Shippers Interstate Service,*

*Inc.,* 618 F.2d 9 (7th Cir. 1980) (stay provisions of Bankruptcy Act of 1898 did not preclude unfair labor practice proceedings before NLRB).

*Brennan v. T & T Trucking, Inc.,* 396 F.Supp. 615 (N.D.Okl.1975) is another example. The Secretary of Labor sought to enjoin defendants from violating §§ 15(a)(2) and (5) of the FLSA, and to restrain any withholding of payment of overtime compensation. Six months later, the debtors (defendants) filed for bankruptcy relief under the old Bankruptcy Act. The district judge rejected the debtors' request to stay the FLSA proceeding. In doing so, the court, citing *Wirtz v. Jones,* 340 F.2d 901, 903 (5th Cir. 1965), held that injunctive relief under § 217 of the Act was designed and enacted as a necessary measure to assure the uniform adherence to the public policy relating to wage standards for labor, adopted in the national interest. 396 F.Supp. at 617. Injunctive relief was appropriate therefore where the Secretary brings an action to prevent further violations of the FLSA. *id.* at 618. Thus, the court permitted the Secretary to proceed, finding his action was not brought to collect a debt, but to promote the strong public policy of protecting employers who pay a lawful wage.

The stay provided under the old Act likewise was inapplicable to the Department of Labor's action in *In re Joydon, Inc.,* 4 Bankr.Ct.Dec. 166 (Ref.N.D.Ohio 1978). Joydon's employees were not paid during the last three weeks of operation in violation of 41 U.S.C. § 351 *et seq.* (McNamara-O'Hara Service Contract Act of 1965, requiring wage floors and fringe benefits for service employees). The Court found that the Act provided remedies designed to restore illegally withheld benefits to the employees as well as to remove violators from actively participating in government contracts. "Also there is a more fundamental policy involved, that policy being the public interest in the enforcement of a social remedial Act of Congress." 4 Bankr.Ct.Dec. at 167. Thus, the court allowed the government to pursue its course in seeking restric-

tions against the debtor before the administrative body set up by the Act.

Finally, in *In re Tauscher*, 7 B.R. 918 (Bkrtcy.E.D.Wis.1981), the debtors filed for relief under the Code in April, 1980. On January 8, 1981, the district court enjoined defendants from violating, *inter alia* §§ 6, 7, 11(a), 12(c) and 15(a)(2) of the FLSA (29 U.S.C. §§ 206 and 215(a)(2)). The court also enjoined violations of § 215(a)(1):

> Defendants shall not, contrary to section 15(a)(1) of the Act, transport, offer for transport, ship, deliver, or sell in commerce, as defined by the Act, or ship, deliver or sell with knowledge that shipment or delivery or sale thereof in commerce is intended, any goods in the production of which any of their employees have been employed at rates of pay less than those provided by sections 6 and 7 of the Act.

*Marshall v. Trout Creek Enterprises*, Civil Action File No. 79 C 111, Slip op. at 3 (E.D.Wisc. Jan. 8, 1981). The Bankruptcy Court, 7 B.R. at 919–920, subsequently ruled that the injunctive relief obtained by the Secretary could continue, notwithstanding the pendency of the bankruptcy proceeding. However, the court did rule that enforcement of the money judgment would be stayed by § 362(a).

### B

In the last two years, a number of courts have enforced the stay against the government, holding that the governmental action was not in furtherance of police or regulatory powers, and thus, not sanctioned by (b)(4).

A Missouri statute authorizes the State to apply to state court for appointment as receiver of a bankrupt's grain warehouse. The State is then permitted to operate and liquidate the warehouse. The statute is designed to protect the interest of those who stored grain in the debtor's warehouse. In *State of Missouri v. U. S. Bankruptcy Court*, 647 F.2d 768 (8th Cir. 1981), the Court of Appeals held that the automatic stay prohibited the State from exercising this statutory power. The Court pointed out that the objective promoted by the statute was the pecuniary interest of the firms which stored grain in the warehouse, and not the public health or welfare; and the statute operated to sanction a direct and irreparable interference with the res under the control of the bankruptcy court. As will be discussed shortly, the injunctive relief granted by this Court was designed to promote public health and welfare, and did not interfere with the debtor's property to the extent that the State of Missouri threatened in the Eighth Circuit case.

A State was also rebuffed in its efforts to enforce a state law which favored certain creditors in *In re Joe DeLisi Fruit Co.*, 11 B.R. 694 (Bkrtcy.D.Minn.1981). There, the debtor, in compliance with state law, posted a letter of credit in favor of certain creditors. When the debtor defaulted, the creditors notified the proper state authority. Shortly thereafter, the debtor filed a voluntary petition under Chapter 11. The state then began its proceeding to determine the proper allocation of the proceeds of the letter of credit. The Bankruptcy Court held the State proceeding was stayed and not within the (b)(4) exception. The Court reasoned that the state law was enacted for the protection of a certain class of creditors, not for the public health and welfare. In fact, the state was not a party to the proceeding but served in a quasi-judicial capacity.

Similar considerations prompted the court in *In re Dan Hixson Chevrolet Co.*, 12 B.R. 917 (Bkrtcy.N.D.Tex.1981) to stay a state proceeding. The Texas Department of Motor Vehicles sought to terminate a dealer's license because of its failure to honor warranty claims and its fraudulent practices. However, a private party instigated the proceedings and, as in *Joe Delisi*, the state played a quasi-judicial role. The Court concluded that "where the administrative agency is acting in a quasi-judicial capacity seeking to adjudicate private rights rather than effectuate public policy as defined by regulatory law the (b)(4) exception is inapplicable." *id.* at 921. Of course, in the case *sub judice* the Court is not concerned with

the adjudication of private rights. Significantly, the *Dan Hixson Chevrolet* court distinguished *N. L. R. B. v. Evans Plumbing Co., supra*, noting that although an NLRB proceeding is initiated by an aggrieved party, the Board's adjudicative function is in fact designed to effectuate public policy. 12 B.R. at 922 n. 8. The FLSA, like the National Labor Relations Act, does more than fix certain contract terms relating to wages and hours; the act reflects the concern of Congress for the health and safety of every worker in America, a legislative enactment spawned by public policy decisions of unmatched importance.

One other case involves the government's efforts to regulate the relationship between two private parties. In *In re Jacobsmeyer*, 13 B.R. 298 (Bkrtcy.W.D.Mo.1981), the Missouri Department of Liquor Control attempted to enforce a state law which limited the amount of credit which a wholesaler could extend to a retailer. The object of the law was to inhibit wholesalers from controlling, through the extension of credit, the liquor retailers. In *Jacobsmeyer*, the retailer who had filed under Chapter XIII was indebted to the wholesaler in excess of the statutory limit. The State sought to enjoin the debtor from purchasing any additional liquor from that wholesaler, arguing that the injunction did not legally obligate the retailer to pay prepetition debts—at least, not in the sense of a money judgment. The retailer, however, insisted that to operate a liquor store he had to purchase beer from that particular wholesaler. The State law, in practical effect, barred the retailer from operating under the auspices of Chapter XIII until that prepetition debt was paid. The Court accepted the retailers argument and prohibited the State from enforcing the liquor law.

The *Jacobsmeyer* case is not easily reconcilable with the Court's holding in this case. In both cases, the State (or federal government) sought an injunction which would effectively preclude a viable reorganization plan. In both cases, the only avenue open to the debtor to dissolve the injunction was to pay a prepetition debt. Indeed, the injunction was granted solely because of the prepetition obligations. While the Court notes the similarity between the *Jacobsmeyer* case and this case, the Court is not persuaded by that bankruptcy court's reasoning in this context. First, there is a substantial difference between a state liquor law which regulates the relationship between retailers and wholesalers and the Fair Labor Standards Act. While there are surely important public welfare concerns which prompted the enactment of the state law, they certainly don't compare with the purposes underlying the FLSA. Second, the FLSA protects not only the employees but also the employer's competitors. *See generally, Maryland v. Wirtz*, 392 U.S. 183, 188–91, 88 S.Ct. 2017, 2019–21, 20 L.Ed.2d 1020 (1968). The bankruptcy court could not ensure, in approving the reorganization plan, that this goal of the FLSA would be furthered.

Finally, in this case, it would be inaccurate to describe the means by which defendants could gain relief from the injunction as simply the payment of a prepetition debt. The FLSA imposes a statutory duty on the employer to pay his employees at least a minimum wage. The employer has violated a federal statute, it has not merely breached a private agreement, and it is the enforcement of the statute, not compliance with a private contract that concerns the Secretary.[4]

In three cases, the government sought to invoke the (b)(4) exception in support of its monetary claim against the debtor. *In re Pizza of Hawaii Inc.*, 12 B.R. 796 (Bkrtcy.D. Haw.1981) (State seeks to terminate license because of delinquent tax bill); *In re Adana Mort. Bankers*, 12 B.R. 989 (Bkrtcy.N.D.Ga.

---

**4.** Thus, the tainted goods would be purged once the employer satisfied the requirements of §§ 206 and 207, the payment of the minimum wage. Although the parties never raised this matter at the hearings, *it would seem that the payment of the minimum wage, and not actual accrued wages is all that is necessary.* The Court has searched in vain for any authority for the Secretary to seek any more than the payment of the minimum wage and appropriate overtime compensation.

1980) (Government guaranteeing mortgages cannot use (b)(4) to bolster its creditor position); *In re Gibbs*, 9 B.R. 758 (Bkrtcy.D. Conn.1981) (Housing Authority seeks to evict tenant on the basis of a judgment obtained prior to petition for nonpayment of rent).

Another case involved a state's effort to revoke a medical facility's certificate of need which is required for expansion of the facility. *In re King Memorial Hosp. Inc.*, 4 B.R. 704 (Bkrtcy.S.D.Fla.1980). In *King Memorial*, the court held that the certificate of need laws were not enacted to protect the health and welfare of the public, but rather to stimulate efficient and economical health care expansion efforts. The Second Circuit faced a similar problem in *In re National Hospital & Institutional Builders Co.*, 658 F.2d 39 (2d Cir. 1981), where a city government attempted to rescind a certificate of occupancy for a nursing home. The district court held that the city, insofar as it was attempting to enforce or administer laws relating to the public health and welfare, could proceed under the predecessor of the (b)(4) exception. The Court of Appeals reversed, holding that the good faith of the city was a critical factor in determining that the stay should be lifted. Furthermore, the bankruptcy court had concluded that revocation of the certificate of occupancy was not a valid use of the city's police power.

## IV

■ The Court is persuaded by the decisions in *Joydon, T & T Trucking,* and *Tauscher.* Defendants' argument is not without force: the Bankruptcy Code has an elaborate priority scheme which is designed to protect the interests of the debtor as well as all creditors. The employees of the debtor have their place in that system. To entertain the Secretary's action is to disrupt this orderly scheme and propel the employees into a super-priority status. Furthermore, the employer argues, the injunction interferes with the debtor's assets, the property of the estate which should be under the exclusive control of the bankruptcy judge and not subject to the chaos generated by conflicting decisions of various forums.

This argument is alluring. However, it ignores the thrust of the (b)(4) exception which was intended to give the government a super-priority, not a priority to proceeds from the estate, but a priority in terms of having access to any proper court to enforce laws which promote public health and welfare. Whether the law is designed to prohibit fraud, prevent pollution, remove safety hazards, or insure domestic tranquility, the government is not stymied by the debtor's petition in the bankruptcy court. The Fair Labor Standards Act is just such a law. The Act does more than provide for the collection of unpaid minimum wages. Section 2 of the Act provides,

(a) The Congress finds that the existence, in industries engaged in commerce or in the production of goods for commerce, of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States; (2) burdens commerce and the free flow of goods in commerce; (3) constitutes an unfair method of competition in commerce; (4) leads to labor disputes burdening and obstructing commerce and the free flow of goods in commerce; and (5) interferes with the orderly and fair marketing of goods in commerce. That Congress further finds that the employment of persons in domestic service in households affects commerce.

(b) It is declared to be the policy of this chapter, through the exercise by Congress of its power to regulate commerce among the several States and with foreign nations, to correct and as rapidly as practicable to eliminate the conditions above referred to in such industries without substantially curtailing employment or earning power.

29 U.S.C. § 202. In *United States v. Darby*, 312 U.S. 100, 109–110, 61 S.Ct. 451, 454–455, 85 L.Ed. 609 (1941), the Court recognized the Act's purpose:

> [T]o exclude from interstate commerce goods produced for the commerce and to prevent their production for interstate commerce, under conditions detrimental to the maintenance of the minimum standards of living necessary for health and general well-being; and to prevent the use of interstate commerce as the means of competition in the distribution of goods so produced, and as the means of spreading and perpetuating such substandard labor conditions among the workers of the several states.

*See also Wirtz v. Jones, supra; Donovan v. University of Texas, supra.*

Compliance with the FLSA by one firm protects the workers of competitors. Violation of the minimum wage and overtime compensation provisions threatens the welfare of every worker in that firm as well as the workers in competing companies and related industries. The only means of reducing the impact of violations on an entire industry is to enjoin the shipment of tainted goods. In *Maryland v. Wirtz*, 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968) the Court examined the policy considerations and Congressional findings which spawned the Act:

> Congress had found that substandard wages and excessive hours, when imposed on employees of a company shipping goods into other States, gave the exporting company an advantage over companies in the importing States. Having so found, Congress decided as a matter of policy that such an advantage in interstate competition was an "unfair" one, and one that had the additional undesirable effect of driving down labor conditions in the importing States.

*id.* at 189, 88 S.Ct. at 2020. *See also Wirtz v. Powell Knitting Mills Co.*, 360 F.2d 730 (2d Cir. 1966).

The concern with the health and welfare for the American worker, and the need to reduce labor strife is at the core of the FLSA. To allow a petition in bankruptcy to preempt the relief available to the Secretary to protect the health and welfare of American workers is unimaginable.

It is important to note that this Court's first decision was to grant the injunction on March 12. Following that decision the attorneys for Chemical Bank, Defendants, and the Labor Department met continuously—at their offices and in chambers—to work out a compromise to permit Defendants to begin operations. The parties had tentatively agreed on a plan, but the agreement was aborted when representatives from an ad hoc employee group objected. The Court's order of March 19, 1982 was based on the parties' tentative agreement. The conditions set out for lifting the stay should not be construed as a money judgment. Rather, the conditions represent an option available to the debtor to comply with the FLSA and thereby dissolve the injunction.

In order to cleanse the goods of WWG which were produced in violation of the FLSA from the taint resulting from that violation, provision must be made for certain payments to the Secretary. Although the sum required to remove the "taint" of such goods is measured by the unpaid wages[5] of the employees of WWG employed in the production of these goods, the sums provided for herein are not wages but are the sums required to remedy the FLSA violation.

### APPENDIX

HAROLD L. MURPHY, District Judge.

It is hereby ORDERED:

In order to cleanse the goods of WWG which were produced in violation of the FLSA from the taint resulting from that violation, provision must be made for certain payments to the Secretary. Although the sum required to remove the "taint" of such goods is measured by the unpaid wages of the employees of WWG employed

---

**5.** But see n. 4 supra.

in the production of these goods, the sums provided for herein are not wages but are the sums required to purge the above-described taint under the FLSA.

From WWG borrowings, as authorized by orders entered in the bankruptcy case of *In re WWG Industries, Inc.*, Case No. 82–00156R, (Bkrtcy., N.D.Ga., Rome Div. March 11, 1982), WWG will place the sum of $500,000 in a trust fund as initial payment of sums due the Secretary to remove the taint on finished goods produced in violation of the FLSA. This trust fund shall be placed in interest-bearing accounts or investments which are obligations of or guaranteed or insured by the United States or its agencies. The interest or other income earned by these accounts or investments shall be included in the fund and shall be used along with the principal to satisfy the Secretary's claim. The Secretary shall have the privilege of disapproving persons designated by WWG as trustee of the trust fund. The Secretary shall not be obligated to pay any expense of the trust.

WWG shall add to this trust fund an amount equal to 5% of net collections from accounts receivable specifically traced from debtor's work-in-progress and raw materials on hand on March 12, 1982 as these collections are made in order to remove the taint upon goods or work in process.

This Court is aware that WWG, to secure its Chapter 11 obligations to Chemical Bank, has granted Chemical Bank a security interest in defendant's now owned and hereafter acquired inventory of raw materials, work in progress, and finished goods and its now owned and hereafter acquired equipment, and in any products and proceeds of these, including post-petition receivables arising therefrom. This Court is also aware that these assets will secure any renewal, extension, or increase in Chapter 11 obligations.

Defendant shall not hereafter pledge voluntarily these assets to any party other than to Chemical Bank to secure Chapter 11 obligations. The purpose of this condition is to provide that these assets shall remain free of further liens and encumbrances so that the equity in said assets shall be available (after satisfaction of the Chapter 11 obligations of Chemical Bank) for payment of administrative expenses comprehended in Bankruptcy Code § 507(a)(1), including sums necessary to purge the taint on goods produced in violation of the FLSA.

When and if the trust fund is sufficient to satisfy the sums necessary to remove the taint on defendant's goods no more additions shall be made to the fund, and the condition upon defendant, set out in paragraph 4, not to pledge its raw materials and work in progress shall end.

The obligations of the parties under this order shall be effective when the injunction which prohibits the transporting, shipping, delivery and selling of carpet and which is set forth in the Order, entered March 12, 1982 in this action is vacated.

This is not a money judgment. Failure to comply with this Order cannot result in execution or levy. This Order constitutes a modification of the injunction of March 12, 1982, and sets forth the conditions upon which it will be dissolved.

The Court retains jurisdiction of this matter to insure compliance with the terms and conditions of this Order vacating the injunction heretofore granted to the extent indicated in this Order.

This Court's Order of March 12, 1982 is vacated to the extent herein indicated.

SO ORDERED, this the 17th day of March, 1982.