## CORN EXCHANGE BANK *v.* SCHEPPERS & Others.

IN ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF PENNSYLVANIA.

Argued March 26th, 1884.—Decided April 21st, 1884.

*Evidence—Promissory Note.*

When in the course of dealings A gives to B one series of his own notes payable to his own order to be used for purchase of an article on his account; another series of like notes as accommodation paper to be protected by the other party at maturity; and a third series, part of which is accommodation paper and a part is issued for the purchase of the article, it is for the jury to say, on a suit against A by a bank to which B had hypothecated one of the third series as collateral, whether B had the right to pledge it for his own debt.

The facts at issue appear in the opinion of the court.

*Mr. N. H. Sharpless* for appellant.

*Mr. C. E. Morgan, Jr.*, for appellee.

Mr. Justice Miller delivered the opinion of the court.

The plaintiff in error, who was plaintiff below, brought its suit against the defendants on five promissory notes held by the bank, made by the defendants in their partnership name of Scheppers Brothers, payable to their own order and indorsed by them in blank.

Defendants pleaded non-assumpsit, and on trial by jury a verdict and a judgment on it was rendered in favor of defendants.

A bill of exceptions was taken, on which arises the only question in the case for our consideration. From this it appears that the notes sued on were the last of several renewals of two notes of $5,000 each, which had been delivered by defendants to the business firm of Benjamin Bullock's Sons, wool brokers, and by them delivered to the bank. No question arises, as these notes were negotiable, that if the bank received them, as it alleges, as collateral security for a debt of Benjamin Bullock's Sons to it, that plaintiff must recover in this action.

On the other hand, if the two notes were merely left in the office of the bank for safe keeping, temporarily, as sworn to by Joseph Bullock, a partner in the firm of Benjamin Bullock's Sons, then plaintiff should not recover.

This was the only question finally submitted to the jury.

It appears by the bill of exceptions, and it is so stated in the charge of the court to the jury, that the "testimony of Mr. Bullock and Mr. Schetky (the cashier of the bank) is in direct conflict, and the question involved in the case depends mainly upon the credit which you shall attach to what the one or the other of these witnesses says. The claim and right of the bank as set up rests on a receipt of the notes from Joseph Bullock, as collateral security for the $50,000 loan. Joseph Bullock testifies that the bank did not so receive them, while Mr. Schetky testifies that it did; which of these witnesses will you believe?"

To aid the jury in the solution of this question, the judge, at

three different points in his charge, told them, without qualification, that Mr. Bullock had received these notes of defendants to be used for the purchase of wool for them, and for no other purpose, and that it would have been a breach of faith on his part to use them as security for this loan. " Is it probable," he says, " that Mr. Bullock would voluntarily have made such a disposition of collaterals for a debt already in existence, especially as he would have to break his faith with Scheppers Brothers, by misapplying their property to his own use? I do not (he says) suggest that it is or is not probable that he would do this, but simply submit the consideration to you as one that properly arises in passing upon the question involved."

The plaintiff excepted to this part of the charge, not on the ground that if these notes were in the possession of Bullock, with no other right than to use them for the benefit of defendants in purchasing wool, the inference suggested was not justified, but that the court erred in assuming the fact to be, that the notes were held by Bullock for that purpose alone. Whether the judge was correct in this assumption is mainly to be ascertained from the written contract between defendants and Bullock's Sons, and the language of certain receipts given by the latter for notes received from Scheppers Brothers.

The first of these is as follows:

"PHILADELPHIA, *May* 29, 1873.

"BENJAMIN BULLOCK's SONS, Philadelphia.

"Gentlemen : We wish you to purchase for us 300,000 pounds of fleece washed, tub washed, and unwashed wool in Pennsylvania and Ohio at first cost, not exceeding 42 and a half cents for washed wool and 30 cents for unwashed ; said wool to be purchased with a specialty for the combing and delaine qualities. It is distinctly understood you will charge, in addition to the above prices, a commission of two cents per pound, which is the commission you pay your agents. We also agree to pay freight, drayage, storage and insurance on same, and allow you 5 per cent. commission on the actual cost of the above wool. We will issue our notes from time to time, as you may require, and at such dates as we can mutually agree on ; said paper to be converted into money for our account at the

market rate.   We agree, should we desire to sell any portion of the wool—that is, clothing—we will allow you 5 per cent. commission for selling, grading and guaranteeing the sale..

> " (Signed)          SCHEPPERS BROTHERS."

> " PHILADELPHIA, *May* 29, 1873.

> " The above order we accept, and shall endeavor to fill to the best of our ability.          Very truly,

> " BENJAMIN BULLOCK'S SONS."

Another order of July the 3d, enlarged the amount of wool to be purchased 500,000 pounds, making 800,000 pounds in all.

In the course of this business, and between May 29th and August 1st, inclusive, many notes of defendants were delivered to Bullock's Sons, and by them negotiated.   Receipts were given for these notes, which are produced, to the number of six or seven.   Some express on their face that the notes are received for wool purchased.   Others say on account of wool purchased or to be purchased.

One, dated June 23d, acknowledges the receipt of 20 notes of $5,000 each, amounting to $100,000, the concluding words of which are: " These notes being issued for our benefit to be protected by us at maturity.   Benjamin Bullock's Sons."

It was fully proved that these latter notes were understood to be accommodation paper.

The last of these receipts—the one which embraces the two notes in question—reads thus:

" Received, Philadelphia, August 1st, 1873, of Scheppers Brothers their 30 promissory notes, each for $5,000, maturing as follows: 1 January 2–5, 1 January 5–8, 1 January 7–10, 1 January 14–17, 1 January 18–21, 1 January 21–24, 1 January 25–28, 2 January 28–31, 2 February 4–7, 2 February 8–11, 2 February 11–14, 3 February 15–18, 2 February 18–21, 3 February 22–25, 4 February 25–28, aggregating in amount $150,000 for purchase of wool, or to be protected by us at maturity.

> " BENJAMIN BULLOCK'S SONS."

We have, then, three classes of receipts given by Bullock's Sons for notes received of Scheppers Brothers during this two months' dealing.   One class, the most numerous, expresses that

the notes were received for wool purchased or for wool to be purchased, and having reference, no doubt, to the contract on that subject. Another acknowledges the receipt of notes to the amount of $100,000, to be used as accommodation paper, to be protected at maturity by Bullock's Sons. The third— the one which was given for the two notes in question, and 28 others, which are said to be " for purchase of wool, or to be protected by us (Bullock's Sons) at maturity."

We do not think, in the light of all the circumstances, and the other receipts, and the admitted fact that Scheppers Brothers had only a few weeks before issued them the accommodation notes for $100,000, this receipt can mean anything but this : " So far as we use these notes for the purchase of wool for Scheppers Brothers they will pay them at maturity, and so far as we may use them for our own benefit as accommodation paper they are to be protected by us."

There is no inconsistency in the idea that Scheppers Brothers so trusted them. They had done so to the extent of $100,000. They were still buying wool for them under the contract. Of this large sum of $150,000, Bullock's Sons could be trusted to use some of the notes for their own benefit, on their promise to protect the notes so used, while they would probably use some of them, possibly all of them, in purchase of wool under the contract, in which case Scheppers Brothers must pay them as they matured. In no other way can any meaning be given to the alternative words at the close of the receipt, " *or to be protected by us at maturity.*"

This view is not varied by the oral testimony of two witnesses, who state that the notes in this receipt were given to be used for the purchase of wool, as they understood it, but neither of these is the person who signed the receipt, and neither of them says that there was no permission to use some of the notes for the accommodation of Bullock's Sons.

To say they were to be used for purchase of wool is to repeat what the receipt says, and is in accord with it. To deny that some of them might be used for the benefit of Bullock's Sons is to contradict the receipt, and no one does deny it in express terms.

If, however, any witness had so sworn who was present when the receipt was signed and the notes were delivered, it was a question for the jury whether his statement or the writing produced was the most credible, and this question the judge took from them by his peremptory instruction, three times repeated, that there was no right in Bullock's Sons to pledge the notes as collateral for their own debt, and to do so was to break faith with Scheppers Brothers.

For this error, important in the narrow point in issue,

*The judgment of the Circuit Court is reversed, and the case remanded for a new trial.*