**In the Matter of CANARICO QUARRIES, INC., Debtor.**

**Civ. No. 78–1457.**

United States District Court, D. Puerto Rico.

March 9, 1979.

José A. Cepeda Rodríguez, Santurce, P. R., for plaintiff.

William H. Beckerleg, Hato Rey, P. R., for defendant.

## OPINION AND ORDER

TOLEDO, Chief Judge.

This case comes before this Court pursuant to an appeal from a judgment entered by the Bankruptcy Court staying the Puerto Rico Environmental Quality Board, ("Appellant" or "EQB"), from enforcing its regulations against Debtor-Appellee, under the provisions of Rule 11–44(a) of the Rules of Bankruptcy, Title 11, United States Code, Rule 11–44(a). The effect of the ruling of the Bankruptcy Court is to authorize Appellee's operation without obtaining the necessary permit from the Puerto Rico Environmental Quality Board.

### FACTUAL BACKGROUND

The Puerto Rico Environmental Quality Board is an instrumentality of the Commonwealth of Puerto Rico, created by the Environmental Public Policy Act of June 18, 1970, as amended, Title 12, Laws of Puerto Rico Annotated, Section 1121 et seq. Appellant is entrusted with establishing and implementing the public policy as to the environmental matters of the Commonwealth. It is also the designated State Agency for all purposes of the Federal Clean Air Act. Title 12, Laws of Puerto Rico Annotated, Section 1135. Accordingly, Appellant promulgated the Regulation for the Control of Atmospheric Pollution ("RCAP"), as part of its State Implementation Plan ("SIP"), required by Section 110 of the Federal Clean Air Act. Title 42, United States Code, Section 7410. The Bankruptcy Court's ruling herein appealed contravenes the provisions of the above mentioned regulation for the control of atmospheric pollution.

Appellee Canarico Quarries, Inc., operates a quarry of significant size in the Municipality of Juana Diaz. It is considered to be a major emitter of particulate matter, as defined in the RCAP.

In July of 1974, EQB initiated action against Appellee when it issued a cease and desist order with the purpose of stopping Appellee's unauthorized operation. Canarico voluntarily accepted by stipulation that it was operating in violation of the RCAP. Appellee agreed to submit a Compliance Plan proposing control measures and a schedule for their implementation. It was understood that after the implementation of such measures, Appellee would be issued a permanent authorization to operate. Canarico was temporarily authorized to operate subject to the implementation of the control measures of the plan.

The plan prepared by Appellee and approved by Appellant provided for compliance with the RCAP by July 30, 1975, by which date Appellee estimated it would have installed all control measures proposed in the Compliance Plan. Said plan included the installation of dust control equipment, and the total cost of such installation was estimated by Appellee to be $323,000.00.

Over one year after the target date of the Compliance, on September 22, 1976, Appellant once again initiated enforcement action against Appellee, this time for noncompliance with the conditions of the approved plan. Canarico had not obtained authorization for its operation because full compliance had not been attained. The EQB granted Canarico the opportunity to submit a revised work plan for the completion of the control measures required under the original Compliance Plan.

On June 9, 1977, Appellant rejected Canarico's work plan and ordered it to cease and desist its contaminating operations. Appellee was granted an opportunity to show cause why such order should be set aside.

In July, 1977, Canarico petitioned the Superior Court of the Commonwealth of Puerto Rico, San Juan Section, for an injunction against the cease and desist order of June 9. The petition was denied because the Court ". . . has made a careful balance between the interests of the Petitioner and those represented by the Environmental Quality Board and concludes that the public interest must prevail and the Cease and Desist Order issued by the Environmental Quality Board on June 9, 1977, must remain in full force." (See Plaintiff's *Memorandum*, filed on January 9, 1978, at p. 3).

Thereafter, on August 2, 1977, Canarico filed a petition under Chapter XI of the Bankruptcy Act, Title 11, United States Code, Sections 701–799, and on August 3, 1977, the Bankruptcy Court issued an Order authorizing the operation of its business. The Environmental Quality Board initiated an adversary proceeding, requesting that the Order authorizing Appellee's operation be vacated and that Appellee be ordered to comply with State regulations, thus rendering the stay provisions of Rule 11–44(a) inapplicable to this case. The Bankruptcy Court denied Appellant's petition and the present appeal was filed from that Order.

## THE LAW

The Federal Clean Air Act, Title 42, United States Code, Section 7401 *et seq.*, requires that each State[1] formulate, subject to the approval of the Environmental Protection Agency ("EPA"), an implementation plan for the achievement and maintenance of the national standards. Recognizing that prevention and control is the primary responsibility of States and local governments, the State Implementation Plan is the means by which each State defines the strategy for achieving the national standards and controlling the emissions from the source of each air pollutant operating within its jurisdiction, as well as the establishment of new sources. Title 42, United States Code, Sections 7401(a)(3); 7410.

Section 108(a) of the Clean Air Act, Title 42, United States Code, Section 7408, requires that the Administrator of EPA publish a list of each air pollutant which may endanger public health or welfare. This list was originally promulgated by the Administrator in 1971, promulgating national standards for six air pollutants considered to have adverse effects on public health and welfare. See: 40 CFR 50. Among these were the national primary and secondary standard for particulate matter. 40 CFR 50.6 and 50.7.

Puerto Rico adopted its State Implementation Plan for the attainment of the national standards for particulate matter and sulfur dioxide, the two pollutants considered to exceed the national standards within the air quality region of the Commonwealth. The RCAP is part of the strategy required by Section 110 of the Act, supra, and contains among other things, a permits program and procedure to insure the attainment and maintenance of national standards, as well as the prevention of deterioration for those achieved, by means of a preconstruction review process for new sources. See *Train v. N.R.D.C.*, 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975).

The Act is intended to primarily protect public health from the dangers of air pollution. The United States Supreme Court has so recognized in the case of *Union Electric v. E.P.A.*, 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474, June 25, 1976. The Court held that the criteria specified in Section 110, Title 42, United States Code, Section 7410(a)(2)(A)(H), do not permit the review of technological and economic factors in the review by the Administrator of a SIP. The Court stated:

"Section 110(a)(2)(A)'s three-year deadline for achieving primary air quality standards is central to the Amendments' regulatory scheme and, as both the language and the legislative history of the requirements make clear, it leaves no room for claims of technological or economic infeasibility. The 1970 congressional debate on the Amendments centered on whether technology forcing was necessary and desirable in framing and attaining air quality standards sufficient to protect the public health, standards later termed primary standards. The House version of the Amendments was quite moderate in approach, requiring only that health-related standards be met "within a reasonable time" H.R.17255, 91st Cong. 2d Sess. 108(c)(1)(C)(i) (1970). The Senate bill, on the other hand, flatly required that, possible or not, health-re-

---

1. For the purposes of the Act, the Commonwealth of Puerto Rico is considered a State. Title 42, United States Code, Section 7602(d).

lated standards be met "within three years." S.4358, 91st Cong. 2d Sess. 111(a)(2)(A) (1970).

The Senate's stiff requirement was intended to foreclose the claims of emission sources that it would be economically or technologically infeasible for them to achieve emission limitations sufficient to protect the public health within the specified time. As Senator Muskie, manager of the Senate Bill, explained to his chamber.

"The first responsibility of Congress is not the making of technological or economic judgments—or even to be limited by what is or appears to be technologically or economically feasible. Our responsibility is to establish what the public interest requires to protect the health of persons. This may mean that people and industries will be asked to do what seems to be impossible at the present time." 116 Cong.Rec. 32901–32902 (1970) 8 ERC 2143 at 2147.

With respect to the stationary sources, the Act established in Section 110(f), Title 42, United States Code, Section 7410(f), the only instance when economic considerations may be considered in the application of the Act, and be the reason for extensions of the deadlines established in the SIP for attainment of national standards. Said Section 110(f) of the Clean Air Amendments of 1977, deals only with temporary emergency suspensions, which may be granted only by the Governor of the State, and must be approved by the Administrator. The Clean Air Amendments of 1977, add Section 125, Title 42, United States Code, Section 7425, which provides for measures to prevent significant local or regional economic disruption or unemployment. The Amendments place such authority exclusively on the Governor of the State, the Administrator, or the President of the United States.

Puerto Rico's plan provides for the attainment of the national standards by April 30, 1975, which is established as the Clean Air Date, that is, such date when all sta-

tionary sources should be in compliance. See: RCAP, Article 1. The State Implementation Plan, through the RCAP, incorporated a variance procedure for those sources which required extensions of mandatory compliance deadlines due to their particular circumstances. RCAP, Article 3.4.

The 1977 Amendments to Section 110(g), modified the old Section 110(f) of the Amendments of 1970, which was the basis for the variance provisions of the SIP, as well as Section 110(a)(3), which provides a mechanism for revision. *Train,* supra. The Supreme Court in *Train* made it clear that in no case does the Act allow any interference with the national standards. It went so far as to add that the polluter litigated at its own time, not the public's. See also *Getty Oil Co. v. Ruckelshaus,* D.C., 342 F.Supp. 1006, 3 Cir., 467 F.2d 349.

In the Clean Air Act Amendments of 1977, Congress reaffirmed the environmental goals established by the previous legislation. In assigning priorities, Congress has clearly established that environmental quality shall not be subservient to the economic considerations, even so in times of high inflation and a world-wide energy crisis.

The Commonwealth of Puerto Rico was fully aware of its responsibility in protecting the environment and of the dangers that its deterioration represents to the public:

"The Commonwealth of Puerto Rico being aware of the profound impact of man's activity in the interrelations of all the components of his natural environment, especially the great influences of the populational growth, the high density of urbanization, the industrial expansion, the resources of exploitation, and the new and diffused technological progress, further acknowledges the critical importance of restoring and maintaining the environmental quality in behalf of the total welfare and development of man, declares that it is the continuous policy of the Commonwealth, including its municipali-

ties, in cooperation with interested public and private organizations, to use every practical means and measures, including technical and financial aid, with the purpose of encouraging and promoting the general welfare, to create and maintain the conditions under which man and nature may exist in productive harmony and to comply with the social and economic needs and any other needs which might arise with present and future generations of Puerto Ricans." 12 LPRA § 1123(a).

We now turn to consider whether Rule 11–44(a) of the Rules of Bankruptcy stays the applications of the RCAP to Canarico, thus exempting it from complying with the national standards and goals set forth in the Federal Clean Air Act.

Under Section 314 of the Bankruptcy Act, Title 11, United States Code, Section 714, the Bankruptcy Court has jurisdiction to, among other things, enjoin or stay until final decree the commencement or continuation of suits other than suits to enforce liens upon the property of the debtor. Rule 11–44(a) supplements the policy of Section 314 by providing for the automatic stay of proceedings against the debtor or his property upon the filing of a petition under Rule 11–6 or 11–7.

The Advisory Committee's Note to Rule 11–44, reads:

"Subdivision (a) provides that the petition shall operate as a stay of any action, or the enforcement of any judgment, or any act or proceeding to enforce a lien on property of the debtor or any proceeding commenced for the liquidation or rehabilitation of the debtor. This conforms Chapter XI cases with Chapter X cases, by including those matters within sections 113, 116, and 148, [sections 513, 516, and 548 of this title], such as a pending bankruptcy proceedings, mortgage foreclosure, equity receivership, and the procedure would be the same representing a change from section 325 of the Act. The reference to stay of the proceedings against the debtor is to signify the inclusion of a pending arbitration proceeding within the scope of the automatic stay."

In the case at bar the question that arises is whether it is within the Bankruptcy Court's jurisdiction to authorize under the stay provisions of the Act and the Rules, the operation of a debtor in possession when such operation is done in violation of State laws and regulations, and furthermore, it would upset the State's strategy and mix of controls for the attainment of the goals set forth in the Federal Clean Air Act.

The question has been approached as one of whether the claim is one that may be discharged in a bankruptcy proceeding, where creditors are trying to enforce a lien upon a debtor or his property. *In Re Redwood Furniture Co.,* 248 F.Supp. 228 (W.D. N.C., 1965); *In Re Lipman,* 78 F.2d 872 (7th Cir., 1935).

Generally speaking the rule governing the stay provisions of the Act is protection from interference by creditors with the property of the debtor in such a way as to hinder the proper administration of the property. Accordingly, suits or actions which contemplate relief other than the collection of a debt should not be stayed as their prosecution would not ordinarily interfere with the bankruptcy proceeding.

The stay provisions of Rule 11–44 have been held inapplicable to criminal prosecutions by the State for violation of its penal statutes. *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). In *Diversa-Graphics, Inc. v. Sefkowitz,* 2 Bank.Ct. Dec. 194 (S.D.N.Y.; 1976, Babitt, B.J.)—the Court held that Rule 11–44(a) will not stay criminal proceedings since neither it nor its statutory predecessor, Section 314 of the Act, is within the language of Title 28, United States Code, Section 2283. The cases that have put a gloss on Section 314 reject any notion that said Section is an express authorization by Congress contrary to the Federal Policy against non-intervention.

"Chapter XI, granted its rehabilitating purpose, is not to be construed as insulat-

ing debtor from the exercise of the state's policy power expressed in its penal enactments. Public policy insists that transgressions of criminal law be dealt with, and I find no reason to protect this debtor merely because it seeks the benefit of Chapter XI relief." *Diversa*, supra, at p. 197.

In *Ohio Environmental Council v. U. S. District Court*, 565 F.2d 393 (1977), the Court of Appeals for the Sixth Circuit held that the district court abused its discretion by staying a Clean Air Act suit brought by a citizen group to enforce the State Implementation Plan against a non-complying public utility. The Court based its decision on finding that the granting of the stay would disrupt the statutory time-table of the Act, while there were no specific provisions made for safeguards to protect public health.

"We note at the outset that 'the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes in its docket with economy of time and effort for itself, for counsel and for litigants,' *Landis v. North American Company*, 299 U.S. 248, 254–55, 57 S.Ct. 163, 166, 81 L.Ed. 153 (1936), and that the entry of such an order ordinarily rests with the sound discretion of the District Court. We see nothing in the Clean Air Act to alter these basic principles, and reject plaintiff's argument that the District Court is stripped of this fundamental power in the context of an enforcement proceeding simply because its jurisdiction is limited by Section 307(b)(2), Cf., *Scripps-Howard Radio v. FCC*, 316 U.S. 4, 62 S.Ct. 875, 86 L.Ed. 1229 (1942) (Courts of Appeals retain power to order stay during review of FCC determination).

Given this, however, it is also clear that a court must tread carefully in granting a stay of proceedings, since a party has a right to a determination of its rights and liabilities without undue delay. In *Landis v. North American Company, supra,*

the Supreme Court set out guidelines for a court to consider in granting stays. In a suit brought by two holding companies seeking to restrain enforcement of the Holding Company Act, the District Court had entered an order staying all proceedings until the conclusion of the trial and appeal of a similar challenge in another court. The Supreme Court held that such an order constituted a clear abuse of discretion. First, it pointed out: 'The suppliant for a stay must make out a clear case of hardship or inequity in being required to go forward if there is even a fair possibility that the stay for which he prays will work damage to someone else. Only in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both.' 299 U.S. at 255, 57 S.Ct., at 166. Thus, the burden is on the party seeking the stay to show that there is pressing need for delay, and that neither the other party nor the public will suffer harm from entry of the order. A court should be particularly hesitant when, as here, the stay will disrupt a statutory or administrative timetable. Furthermore, even if the reasons for the stay are proper, the stay itself 'is immoderate and hence unlawful unless so framed in its inception that its force will be spent within reasonable limits, so far at least as they are susceptible of prevision and description.' 299 U.S. at 257, 57 S.Ct., at 167. · See also, *Dellinger v. Mitchell*, 143 U.S.App.D.C. 60, 442 F.2d 782 (1971).

Measured by these standards, we reluctantly conclude that the District Court has clearly abused its discretion in entering the present order. With no safeguards for the health of the public, and in spite of the fact that the final deadline for compliance has passed, the District Court has entered an order which could place this case in limbo for years. The cause has already been delayed for more than a year and a half by successive stays." *Ohio Environmental Council*, at page 396.

The actions brought by the Environmental Quality Board against Canarico Quarries were directed to the enforcement of its State Implementation Plan and a strong public policy of prosecuting violations of the regulation promulgated to achieve the national goals, thus serving the public good in the protection of our environment, as well as human health and welfare. Appellee had previously been subject to enforcement proceedings, as a result of which it had admitted non-compliance with the applicable regulations.

Law Number 9 of June 18, 1970, Title 12, Laws of Puerto Rico Annotated, Section 1131, entrusts upon the Environmental Quality Board the responsibility of protecting our environment and regulating all the activities affecting the same. It is settled policy that the State agency's jurisdiction can not be affected in proceedings such as the one here under consideration, since by law such State agency has been granted exclusive jurisdiction in the matter. *Palmer v. Massachusetts*, 308 U.S. 79, 60 S.Ct. 34, 84 L.Ed. 93. The Bankruptcy Court has no express congressional authority to intervene in environmental matters. Congress did not give the Bankruptcy Court exclusive jurisdiction over *all* controversies that in some way affect the debtor's estate. *California Oil Co. v. Huffstutler*, 5 Cir., 322 F.2d 596.

Appellant has rendered a final decision disapproving the revised Compliance Plan submitted by Appellee. We do not see any reason why this Court should usurp powers vested by State and Federal law upon Appellant and substitute our criteria for Appellant's expertise. This Court is in no position to assume the role of the Environmental Quality Board.

The goal of Chapter XI of the Bankruptcy Act is to rehabilitate the debtor. The stay of Rule 11–44(a), aids that rehabilitation and paralyzes suits by creditors or interferences with debtor's property. However, it is our understanding that such rehabilitation must be done within the law. Under no circumstances can there by any rehabilitation outside the law. Debtor must operate its business in full compliance with the laws and regulations of the State. To these effects, Section 959 of Title 28, United States Code, states:

"b. A trustee, receiver or manager appointed in any cause pending in any court of the United States, *including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the state in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.*" (Emphasis added).

To authorize debtor to operate its business without obtaining a permit from appellant, under the protection of Rule 11–44(a), violates Section 959, supra. To allow such violation of state law, is not within the jurisdiction of the Bankruptcy Court. *Brennan v. T. & T. Trucking, Inc.*, D.C., 396 F.Supp. 615 (1975). Chapter XI Rules were meant to be procedural in nature and were not intended to enlarge or modify substantive rights. Title 28, United States Code, Section 2075; *Mid Jersey National Bank v. Fidelity Mortgage Investors*, 3 Cir., 518 F.2d 640.

Congress has recently recognized in an express fashion its intention that public interest regulations are to outweigh that of the Bankruptcy Act and Rules in case of conflict.[2]

The Bankruptcy Reform Act of 1978, has significantly restructured the automatic stay provisions of the Bankruptcy Act. The new Section 362 supersedes the previous legislation. Of importance to this case is Subsection (b) (11 U.S.C. § 362(b)), where

---

**2.** See also: *In Matter of Parkchester General Hospital*, 4 Bankruptcy Court Decisions 292 (1978, N.Y.).

**1340**

exemptions to the automatic stay are enumerated.

It is provided by Subsection 362(b)(4), the following:

"(b) the filing of a petition under sections 301, 302, or 303 of this title does not operate as a stay—

(1) . . .

(2) . . .

(3) . . .

(4) Under subsection a(1) of this section, of the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power; . . ."

In an explanatory comment of this new legislation, the Honorable Asa S. Herzog, Bankruptcy Judge (Ret.), comments the following:

"Paragraph (4) excepts commencement or continuation of actions and proceedings by governmental units to enforce police or regulatory powers. Thus, when a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety or similar police or regulatory laws, or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay . . .

Section 362(b)(4) indicates that the stay under section 362(a)(1) does not apply to affect the commencement or continuation of an action or proceeding by a governmental unit to enforce the governmental unit's police or regulatory power. This section is intended to be given a narrow construction in order to permit governmental units to pursue actions to protect the public health and safety and not to apply to actions by a governmental unit to protect a pecuniary interest in property of the debtor or property of the estate." (*Bankruptcy Code*, 1979 Colliers Pamphlet Edition, Part 3, page 130).

Wherefore, in view of all of the above, we hereby reverse the decision of the Bankruptcy Court. Accordingly, the Stay of Rule 11–44(a) of the Chapter XI Rules is held inapplicable to Appellant's enforcement of its regulations. The case is remanded to the Bankruptcy Court for proceedings in accordance with this opinion.

IT IS SO ORDERED.