**SUCN. SUAREZ Through its members Marcial Suarez Santana; Sara Santana Vda. De Suarez; Aida Miranda Vda. De Suarez; Johnny Suarez Miranda; Robert Suarez Miranda; Jose Suarez Fuentes; Candelaria Vda. De Suarez; Serena Herminia Suarez Candelaria; Eduardo Candido Suarez; Lydia Encarnacion Suarez; Clemente Fernandez, Jr.; Jose A. Montes, Plaintiffs,**

v.

**Pedro A. GELABERT; Fred Soltero Harrington; Gabriel Santos Lopez, Defendants.**

Civ. No. 78–2173.

United States District Court, D. Puerto Rico.

June 21, 1982.

---

Edelmiro Salas-García, Hato Rey, P. R., for plaintiffs.

Paul E. Calvesbert, Hato Rey, P. R., Néstor Ramírez-Cuevas, Dept. of Justice, Commonwealth of P. R., San Juan, P. R., for defendants.

## OPINION AND ORDER

CEREZO, District Judge.

In this case we must consider whether the denial of a sand extraction permit by the Board on Environmental Quality of Puerto Rico (BEQ) violated the Fourteenth Amendment of the Constitution of the United States and the Civil Rights Act, 42 U.S.C. Secs. 1983, 1985. Plaintiffs, the owners and administrators of approximately 75 acres of land in the Municipality of Loíza, Puerto Rico, claim that defendants Pedro Gelabert, Executive Director-Chairman of the BEQ, Fred Soltero Harrington, Secretary of the Department of Natural Resources, and Gabriel Santos López, Mayor of the Municipality of Loíza, deprived them of their property rights without due process of law by refusing to extend to them a permit to extract sand from their property. They allege that defendants' actions constitute a "taking" entitling them to receive as compensation:

(a) the market price of the sand that could have been commercially removed from their farm which is approximately estimated in the sum of $6,000,000;

(b) the value of their land, approximately $8,000,000, since they contend it can only be used for sand extraction because their previous mining activities left a fourteen foot

deep artificial lake that occupies most of the acreage of their property, and;

(c) the investment in machinery to mine this remaining sand in the sum of $175,000 and general damages for suffering and attorney's fees in the estimated sum of $500,000. Plaintiffs also allege that the BEQ action is the result of a conspiracy between the three defendants and that they have been signaled out and treated as scapegoats for political discriminatory reasons.

The defendants have filed Motions for Summary Judgment contending that the complaint fails to state a cause of action, that they are immune to the claim for damages since their actions were discretionary and taken in good faith and that the complaint is barred by the Eleventh Amendment of the Constitution of the United States. The essential inquiry, however, centers on the due process violation.

█ This type of constitutional claim cuts through many overlapping and, at times indistinguishable, zones of private expectations and public interests. Whether these private zones overlap with the sphere of a constitutionally protected interest can only be determined by an ad hoc examination of the nature of the specific injury claimed and the factual circumstances that signal how it came about. *Kaiser Aetna v. United States*, 444 U.S. 164, 175 (1979) 100 S.Ct. 383, 390, 62 L.Ed.2d 332. This weighing of public and private interests "entails an inquiry into such factors as the character of the governmental action, its economic impact and its interference with reasonably backed expectations...." *Pruneyard Shopping Center v. Robins*, 447 U.S. 74, 84, 100 S.Ct. 2035, 2042, 64 L.Ed.2d 741 (1980).

In the case before us, the voluminous documentation offered by the parties in support and in opposition to the Motions for Summary Judgment adequately delineate the basic framework of this action thus enabling the Court to determine if plaintiffs' alleged property injury crosses the boundaries of constitutionally protected rights. We shall thus examine the facts underlying the alleged constitutional violation and interpret them liberally with the proper inferences in view of the adverse effects of a summary dismissal and plaintiffs' right to have valid controversies adjudicated before a jury. Rule 56 Fed.R.Civ. Proc., *Hahn v. Sargent*, 523 F.2d 461 (1st Cir. 1975) *cert. den.* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754.

Plaintiffs obtained their first provisional permit to extract sand from their land on January 29, 1969 when Law No. 132 of June 25, 1968 conferring upon the Secretary of Public Works jurisdiction on said matters was passed.[1] Extensions on the permit were obtained until operations ceased. In 1973, plaintiffs petitioned the Department of Natural Resources (DNR) in view of their interest to continue extracting sand. This petition, however, was denied since they had failed to comply with certain conditions contained in the 1968 permit.[2] In 1976, they petitioned the BEQ for an emission source permit as required by the BEQ Air Pollution Control Regulations. However, no action was taken on the request since BEQ technicians who visited the site found that the sand pumping machines for which the emission source permit was required were not being used and there appeared to be no sand extraction operations. On February 18, 1977, defendant Fred Soltero Harrington, Secretary of the Department of Natural Resources of Puerto Rico, signed a permit (DNR permit) which granted plaintiffs permission to extract sand from their property for a period of one year. The sand to be extracted would come from the bottom of the artificial lake and would deepen it an additional fourteen (14) feet. The DNR permit mentions that their technicians considered an environmental

---

1. The Department of Natural Resources was later entrusted with these functions. See: *P.R. Laws Ann.*, Tit. 3, Sec. 151 *et seq.*

2. Plaintiffs had to submit to the Planning Board a project to develop a residential-tourist com-

plex on their property. At plaintiffs' request, the agency accepted this proposal as an alternative to the requirement that plaintiffs refill the lake. The project was not approved by the Planning Board.

study prepared by José L. Suárez, a biologist, submitted by plaintiffs and a bathymetry of the lake. On September 9, 1976 a public hearing was held in which sixteen persons testified. The DNR determined that the lake could be deepened only to twenty-nine (29) feet to avoid erosion problems in its shoreline, that there was no danger of the lake being contaminated with salt water, that there was no danger to the existing flora and fauna, that no bilharzia was present in the artificial lake, that the mining operations would not contaminate the air with dust and that the lake was not a safety hazard to the community of Loíza. The DNR made reference to the concern of Loíza residents as to drownings that had previously occurred in plaintiffs' lake and in other lakes in the area left behind by other sand mining companies. The DNR concluded that the safety precautions required of plaintiffs—fencing the property, warning signs, a twenty-four hour surveillance and maintaining the shoreline slope at a proper inclination to prevent landslides—were sufficient to deal with whatever dangers to the community the deepening of the existing lake might create. As to the other artificial lakes created by other sand mining companies, the DNR mentioned that they had no jurisdiction over these lakes and suggested that other instrumentalities should deal with whatever safety problems these lakes might create. The one year permit was revocable at any time the petitioners violated its clauses or the laws and regulations of Puerto Rico. The permit was also conditioned on obtaining from the BEQ an emission source permit before starting operations. It should be noted that according to the permits wording, plaintiffs were subject to constant supervision and periodic reporting of their operations to the DNR and they did not acquire a right of ownership over it.

On April 21, 1977, the Municipality of Loíza approved an ordinance which urged the BEQ to hold public hearings on the community's concern with the effect of the renewal of sand extraction operations on the environment and general welfare in light of the recent permit issued by DNR to plaintiffs. Defendant Pedro A. Gelabert later issued a resolution voicing the concern of the Loíza Municipality and appointed an independent Examining Panel composed of engineers and lawyers to conduct public hearings on these matters. On May 6, 1977, defendant Gelabert held a press conference announcing that public hearings would be held due to the Loíza community's concern with the impact on the residents' safety of the recently issued sand extraction permit to plaintiffs and urging all interested parties to attend. An environmental announcement stating the time, place, date and matter to be discussed was also published in the newspaper.

At the public hearing held on May 19 and June 3, 1977, plaintiffs' attorney was present and testified in support of their request to extract sand. Plaintiffs requested an additional hearing to present evidence in their favor. The BEQ granted their request and scheduled a hearing for February 16, 1978. In the meantime, defendant Gelabert had informed codefendant Soltero Harrington that the emission permit would not be issued until the public hearings had concluded. In view of these instructions, Soltero Harrington did not take the additional steps required by DNR before plaintiffs could begin to operate. At this hearing, and at a subsequent one requested by plaintiffs and granted by the BEQ, plaintiffs presented the testimony of Dr. Carlos B. Weller, whose specialty is the effect of radioactivity on the environment, and an undated environmental report prepared by biologist José L. Suárez. These hearings were notified by publication and by mail to plaintiffs' counsel who appeared.

On November 3, 1978, the Examining Panel submitted a Report and Recommendation to the BEQ concluding that plaintiffs' proposed operations entailed a high risk to the safety and welfare of the Loíza community. The panel determined that plaintiffs had failed to observe many conditions imposed by the DNR in the original permits and that when BEQ examiners visited the site few security measures were evident. The panel noted that there are three similarly created lakes in Loíza and

ten persons, mostly minors, had drowned in them. The examiners reported that plaintiffs only presented the testimony of an expert in a field unrelated to the matters discussed, an undated report by biologist Suárez which did not cover matters relative to subterranean waters, noise and atmosphere emission, and that their evidence did not deal with the resulting effects and damages to the environment after the dredging was completed. The expert witness presented by plaintiffs did not present any written report on the potential risk of contamination and in fact admitted that he had only visited the site once for a few minutes. The panel observed that most of the evidence in opposition to continuation of sand extraction consisted of the testimony of members of the community of Loíza which focused primarily on the socio-economic impact of the operations. Plaintiffs barely addressed this issue at the hearings. The panel concluded that the concern of the Loíza community over the dangers created by sand extraction operations was legitimate. It determined that a deepening of the lake would turn the sandy shoreline into very steep and dangerously unstable slopes that could convert the lake into a lethal trap, especially for children wandering near its borders. The Examining Panel also found that the deepening of the lake could contaminate the subterranean high quality water deposits under it considering the proximity of the lake to the Atlantic Ocean. Plaintiffs did not offer evidence to contest this finding. The panel voiced its concern over the possibility of clashes and disturbances between plaintiffs and the community of Loíza in view of the strong opposition shown by the residents against a renewal of the unpopular sand extraction operations of the late sixties and early seventies. The examining panel interpreted the constitutional protection given to the environment in Puerto Rico and the law creating the BEQ to encompass, in its definitions of environment and general welfare, situations such as this one. Thus, it recommended

denial of the permit since the operations would have adverse effects on the health, tranquility and general welfare of this community. The BEQ issued a resolution on November 17, 1978 adopting the Examining Panel's report and denied the emissions source permit. Defendant Pedro Gelabert did not participate in the voting by the BEQ adopting this report since he had learned from the newspapers that this action had already been filed against him.

■ In order to adequately establish their due process claim plaintiffs must show that: (1) they had a property right or constitutionally protected interest; (2) they were deprived of it without due process; and, (3) the deprivation occurred by the action of the state. *Parratt v. Taylor*, 451 U.S. 527, 535–538, 101 S.Ct. 1908, 1912–1914, 68 L.Ed.2d 420 (1981). Since none of the parties have questioned the obvious involvement of the state in the actions supporting this claim, we shall examine the other two requirements to determine the adequacy of plaintiffs' claim.

■ Property rights *per se* are neither created nor defined by the Constitution. Rather, their outline and characteristics are determined by the laws of a state. *Id.* at 529, 101 S.Ct. at 1909; *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). In the present case, a liberal reading of plaintiffs' claims reveals that various interests are alleged to have been injured. Although jumbled in a single allegation, they are really different property interests and expectations that require separate review to see if they are entitled to constitutional protection. We must first consider plaintiffs' claim that they should be compensated the market value of the extractable sand remaining at the bottom of the lake. The claim is apparently based on Article 284 of the *Civil Code of Puerto Rico* (Civil Code)[3] which provides that land ownership rights extend to the subsoil. However, this assumption ignores legisla-

---

**3.** "The owner of a parcel of ground is the owner of its surface and of everything under it. . . ." *P.R.Laws Ann.*, Tit. 31, Sec. 1115.

tion that deals specifically with the mineral resources of Puerto Rico. The Puerto Rico Mineral Act, Law No. 9 of August 18, 1933, as amended, *P.R.Laws Ann.*, Tit. 28, Sec. 110 *et seq.*, expresses in its statement of public policy that the mineral resources of Puerto Rico shall be exploited and utilized "for the benefit of their legitimate owners, the Puerto Rican People..." *id.* and that the exploitation of minerals shall be done in "a manner compatible with the conservation of the other resources and the protection of environmental values." *Id.* The Mineral Act invests the Commonwealth of Puerto Rico with title to whatever commercial minerals exist in the soil and subsoil of Puerto Rico. *Id.* at Sec. 111. Although substances not classified as commercial minerals are free from the controls and limitations of the Act, *id.* at Sec. 114, in the case of sand, the Mineral Act specifically indicates that this mineral will be under the surveillance of the DNR. In fact, the legislature determined that the extraction of sand required a special treatment and passed Law No. 132 of June 25, 1968, *P.R. Laws Ann.*, Tit. 28 Sec. 206 *et seq.*, which requires a permit issued by the Secretary of the DNR in order to extract materials, such as sand, from the earth's crust. This permit is temporary and revocable "when it is shown that the revocation would further the health, safety, the peace or the public interest." *Id.* at Sec. 210(c). The party affected may request a hearing and a reconsideration of the resolution from the Superior Court of Puerto Rico. *Id.* at Sec. 213, 215. The Secretary of DNR also has ample powers to issue orders, reviewable by the court, to holders of permits in order to accomplish the purposes of the chapter. *Id.* at Sec. 217.

The nature of property rights over minerals in Puerto Rico was made clear in *Pagán Torres v. Negrón Ramos*, 578 F.2d 11 (1st Cir. 1978). The District Court had certified to the Supreme Court of Puerto Rico the question presented by plaintiff landowners on the conflict of subsoil rights and the Law of Mines of 1933, as amended, with the provisions of the Civil Code. The Supreme Court determined that the landowners had never possessed the right to subsurface minerals because, prior to the treaty between the United States and Spain[4] after the Spanish-American War, the Spanish Law of Mines of March 4, 1868 vested the state with title to all mines. Individuals exploiting the mines were considered concessionaires, never owners of the minerals. The mines were thus part of the patrimony of Puerto Rico and included as such in the Foraker Act of 1900, 31 Stat. 77, 79. *Pagán Torres v. Negrón Ramos, ante,* at p. 12. The Supreme Court concluded that when the Puerto Rican Legislature adopted the Civil Code in 1902 it could not have transferred mineral rights to individual landowners because it lacked the power to give away the 'patrimony' of the Commonwealth by virtue of the Treaty and the Foraker Act. *Id.* at 13. It is clear that whatever rights plaintiffs assert to have over the remaining sand is one limited to extensive regulation and surveillance. It is definitely not an unqualified property right on which they can reasonably expect to exercise full ownership rights. It is, rather, a special privilege that the state has granted them subject to numerous qualifications. Plaintiffs knew that whatever expectations they had over the use of sand in their land were limited to the Commonwealth's regulation. To assert that a denial of a sand extraction permit entitles petitioners to claim from the government compensation for the amount of sand left is tantamount to imposing on the Government of Puerto Rico the need to compensate for every exercise of its police power. In *Andrus v. Allard*, 444 U.S. 51, 65, 100 S.Ct. 318, 326, 62 L.Ed.2d 210 (1979), the Supreme Court said: "[g]overnment regulation—by definition—involves the adjustment of rights for the public good. Often this adjustment curtails some potential for the use or economic exploitation of private property. To require compensation in all such circumstances would effectively compel the government to regulate by purchase." *Id.* Plaintiffs' contention would

---

4. Treaty of Paris, 30 Stat. 1754, JS 343 (1899).

create the absurd situation in which it would probably be more profitable for a landowner to have his permit denied since he would then have a captive buyer in the government for whatever minerals remain in his land. The extensive regulation of minerals by the Commonwealth of Puerto Rico and the protection of its scarce natural resources were a clear warning to plaintiffs that their right to the sand in their property was, if not inexistent, extensively qualified and conditioned to broad governmental discretion in protecting the public interest. Cf: *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (no expectation when state law provided employment at will of municipality); *Bleeker v. Dukakis,* 665 F.2d 401 (1st Cir. 1981) (employment contract allowing removal at will did not create constitutionally protected interest).

■ Another property interest plaintiffs claim that they have been deprived of is the full use and enjoyment of their land. They claim that most of their land is taken up by the artificial lake and that, therefore, their land is of no use except to mine sand. This claim is manifestly frivolous. The fact that the property may be useless for anything else but sand extraction is simply the result of their own conduct and activity. When they decided to engage in these operations they knew that the end result would be the immense, useless pit now filled with water. It would have been totally unreasonable for plaintiffs to have ignored the many regulations and controls provided by the laws of Puerto Rico over sand extraction and at the same time pretended that they could have dug and extracted all the sand that they wanted without the Commonwealth of Puerto Rico at some point intervening on behalf of the general welfare, if required. There was no reasonable expectation to unlimited mining of sand without there being some governmental restrictions and limitations. The action by the BEQ only restricted the deepening of the lake. The BEQ did not physically invade plaintiffs' land or order them to deliver all the sand in their property to the government. Nor did the BEQ limit plaintiffs' use and enjoyment of their land in any other way. Plaintiffs are still the owners of the land and they may rent, sell or develop it in some other way or refill the pit that they themselves created. The fact that they might not use the property in the most profitable way is not per se tantamount to a taking. *Andrus v. Allard,* 444 U.S. 51, 66, 100 S.Ct. 318 at 327, 62 L.Ed.2d 210 (1979). See: *Agins v. City of Tiburon,* 447 U.S. 255, 260–263, 100 S.Ct. 2138, at 2142, 65 L.Ed.2d 106 (1980), *Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 84, 100 S.Ct. 2035, at 2041, 64 L.Ed.2d 741 (1980); *Kaiser Aetna v. U. S.,* 444 U.S. 164, 180, 100 S.Ct. 383, at 393, 62 L.Ed.2d 332; *Goldblatt v. Hempstead,* 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962). Specially when plaintiffs themselves are responsible for any diminution in value or limitation in the use of their land. The action of the BEQ preventing the continued exploitation of sand does not significantly affect plaintiffs' "bundle of property rights." See: *Andrus v. Allard, ante.* Rather, it is plaintiffs' voluntary decision to exploit their farm in this manner that has perhaps diminished its value or restricted its uses. They should have known, given the law of property of Puerto Rico regarding natural resources, that the operations they chose to conduct were subject to constant regulation, supervision and were intertwined with matters of public policy that at some time might not be balanced in their favor. Whatever "investment backed expectations," see: *Pruneyard Shopping Center v. Robins, ante,* plaintiffs had in their land were unreasonable if they ignored the law of Puerto Rico on the exploitation of natural resources. Plaintiffs obtained profits from their land by extracting sand and the Commonwealth of Puerto Rico initially weighed the balance of interests in their favor. Now that the ever present considerations of public policy have shifted the balance towards the protection of the environment and the community they must take the "bitter with the sweet" *Arnett v. Kennedy,* 416 U.S. 134, 154, 94 S.Ct. 1633, 1644, 40 L.Ed.2d 15 (1974) and conform to the results of such considerations and the protection of legitimate public interests.

At this juncture, having found that plaintiffs have no property right to the sand on their property and no unqualified right to use their property for purposes of mining sand according to Puerto Rican Law, we find that the foundations of their constitutional claim are insufficient. There really would be no further need to continue examining whether the process afforded was due. However, the interests protected by the due process clause are not limited to traditional notions of property rights but may extend to the realm of interests in government-afforded benefits. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1971); *Rose v. Nashua Board of Education*, 679 F.2d 279 (1st Cir. 1982); *Beitzell v. Jeffrey*, 643 F.2d 870, 874 (1st Cir. 1981). The guidelines to this analysis are the reasonable reliance and legitimate expectation a party may have in state conferred benefits. *Id.* We believe that plaintiffs' expectations in the validity of the permit initially granted by the DNR were legitimate. It was reasonable for them to conclude that after the DNR permit was issued they had the government's approval and that they could rely on this permit as valid. See: *Three Rivers Cablevision v. City of Pittsburgh*, 502 F.Supp. 1118, 1131 (W.D.Penn.1980). Such reliance, although very limited considering the highly conditioned characteristics of the permit and its revocable and temporary nature, see: *Jacobson v. Hannifin*, 627 F.2d 177 (9th Cir. 1980); *Oberhelman v. Schultze*, 371 F.Supp. 1089 (D.Minn.1974) aff'd without opinion 505 F.2d 736 (8th Cir. 1974), Cf. *Jago v. Van Curen*, 454 U.S. 14, 102 S.Ct. 31, 70 L.Ed.2d 13 (1981) (entirely discretionary parole board decision did not entail protected interest), was entitled to some procedural protection that would guarantee that plaintiffs receive a fair opportunity to protect their interest. We must examine then if plaintiffs were denied their expectations in the benefit derived from the DNR permit without adequate due process because of an unreasonable, arbitrary, capricious or discriminatory exercise of the Commonwealth's police power over its natural resources.

Plaintiffs claim they were treated as scapegoats for political reasons. However, they have not alleged a single fact to establish some type of separate treatment. In fact, the allegation of discrimination does not even suggest the political ideology that plaintiffs (or for that matter, defendants) hold or the singled out class that they were a part of. It is practically impossible for the Court to conclude that plaintiffs have been discriminated against upon class based characteristics as 42 U.S.C. Sec. 1985 requires or treated unequally in violation of the Equal Protection Clause since they have failed to allege or indicate in any manner to what special class or political group they belonged to or that, during the pendency of the hearings, sand extraction permits were granted to other persons or entities dedicated to that same activity as was the case in *Cordeco Development Corp. v. Santiago Vázquez*, 539 F.2d 256 (1st Cir. 1976). See: *Sternaman v. County of McHenry*, 454 F.Supp. 240 (N.D.Ill.1978). Plaintiffs' conclusory allegation of discrimination cannot, by itself, withstand the thrust of defendants' motions for summary judgment which have effectively pierced their discrimination claim. Their failure to come forward with any supporting facts on their claim of unequal treatment shows a lack of controversy worthy of adjudication on this matter. See: *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968); *Mas Marques v. Digital Equipment Corp.*, 637 F.2d 24 (1st Cir. 1980); *Comtronics, Inc. v. Puerto Rico Tel. Co.*, 409 F.Supp. 800, 807 (DPR 1975). As stated in *Harrison v. Brooks*, 519 F.2d 1358, 1360 (1st Cir. 1975), cited in *Creative Environments, Inc., infra*, "the complaint must allege facts showing that the defendants conspired against the plaintiffs because of their membership in a class and that the criteria defining the class were invidious."

Plaintiffs also urge that the actions of the BEQ are an unprecedented *ultra vires* review of the proceedings and permit issued by the DNR. However, a review of the organic law creating the BEQ and the DNR

does not support their assertion of lack of statutory authority.

A primary factor in this analysis is the fact that Puerto Rico chose to afford constitutional ranking to the conservation, development and use of its natural resources for the general welfare of the community.[5] The agency originally entrusted with the protection and development of natural resources was the Department of Public Works. *P.R.Laws Ann.*, Tit. 3 Sec. 411 *et seq.*, by its Bureau of Mines, Sec. 425–428. These and additional powers were later transferred to the DNR by Law No. 23 of June 20, 1972, *P.R.Laws Ann.*, Tit. 3 Secs. 151–163; The Organic Act of the Department of Natural Resources. This Act placed on the DNR the responsibility of "implementing, with respect to the operational phase, the public policy of the Commonwealth of Puerto Rico contained in section 19 of Article VI of the Constitution as established by the Board on Environmental Quality." *Id.* Sec. 153. The DNR was created to enforce "programs for the use and conservation of the natural resources of Puerto Rico, always within the standards established by the Board on Environmental Quality." *Idem.* The Board on Environmental Quality was created by the Public Policy Environmental Act, Law No. 9 of June 18, 1970, as amended, *P.R.Laws Ann.*, Tit. 12, Sec. 1121–1142. The Public Policy Environmental Act states that one of its purposes is to "establish a public policy which shall stimulate a desirable and convenient relationship between man and his environment ... and to stimulate the health and welfare of man." *Id.* at Sec. 1122. The Act mentions in its Declaration of Policy "the critical importance of restoring and maintaining the environmental quality in behalf of the total welfare and development of man ... and to attain the fullest enforcement of the beneficial uses of the environment without degradation, health or safety hazards or other undesirable consequences." *Idem.* The organism entrusted to ward this public policy was the BEQ. *Id.*

at Sec. 1131(2), (3); *In Re Canarico Quarries, Inc.*, 466 F.Supp. 1333 (DPR 1979). The BEQ is composed of three associate members appointed by the Governor of Puerto Rico with the advice and consent of the Senate. *P.R.Laws Ann.*, Tit. 12, Sec. 1129. The law also creates a Consulting Council for Environmental Protection which includes the Secretary of Natural Resources (DNR), the Secretary of Health, the Secretary of Agriculture and the Chairman of the Planning Board. Among the functions and duties of the BEQ are to take adequate measures, including cease and desist orders, to prevent any damage to the environment and to the natural resources that may be considered by the Board to be irreparable, imminently dangerous to public health and safety and contrary to the public interest, *id.* at Sec. 1131(14)(19)(22). A person affected by the Board's action may request a hearing and judicial review, *id.* at (22) and Sec. 1134. The Board may initiate proceedings to enforce the Act and its regulations and impose administrative fines for violations thereof. *Id.* at 1136.

■ These provisions make it sufficiently clear that the BEQ was not acting *ultra vires* when, at the request of the Municipality of Loíza, it initiated public hearings to discuss that community's concern with the impact of plaintiffs' recently issued sand extraction permit on the safety and welfare of Loíza. Although the DNR permit was conditioned to the BEQ's approval of an emission source, the power of the Board was not limited to surveillance of air pollution. The BEQ intervention with plaintiffs' operations was authorized whether or not the DNR permit mentioned that it was conditioned to the BEQ's approval of the emission source permit. Even assuming that the BEQ grants an emission source permit, if during operations, a certain community, group or entity brings to the attention of the BEQ the potential dangers of the operations it has the statutory power to require operations cease immediately, if it so deter-

---

**5.** "It shall be the public policy of the Commonwealth to conserve, develop and use its natural resources in the most effective manner possible for the general welfare of the community...." P.R.Const., Art. 6, Sec. 19.

mines. The organic act previously discussed clearly bestows upon this instrumentality a much broader intervention and role in accordance with the significance, acknowledged by the law and the Constitution of Puerto Rico, of the protection of its environment and natural resources, a protection mandated by Puerto Rico's geographical limitations and high population density. The Constitution of Puerto Rico and the declaration of policy and purpose of the "Public Policy Environmental Act" attest to the need that the protection of the environment be carried out with the ultimate and essential goal of promoting the welfare of man. Cf. *Three Thousand Residents, etc. v. E. P. A.*, 510 F.Supp. 1102, 1104 (DPR 1981) ("We cannot speak of an act which protects the natural environment without necessarily referring to the welfare of the people surrounded and affected by that same environment.") Due process was not violated, as claimed, by the agency's abuse of power since it is clear from the law that the BEQ has ample power and discretion in safeguarding that the public policy regarding environmental matters be effectively carried out by other Commonwealth agencies.

The final aspect of plaintiffs' due process claim requires that we determine whether their fragile "property attribute" claim over the conditioned DNR permit to mine sand was given its required procedural protection before the BEQ's denial. The attack on the procedure provided by the BEQ is limited to unsupported allegations that the members of the examining board had no "knowledge, inclination or instruction" to act as such, that they were appointed by defendant Gelabert who in turn was appointed by the Governor of Puerto Rico, that they were under the guidance and control of defendant Gelabert because it was to him that they rendered the opinion and that the BEQ had no authority to conduct these hearings. Plaintiffs do not question whether they were adequately notified of the nature of the proceedings, and the record shows that press releases, announcements and notices making express reference to plaintiffs' sand extraction operations and specifying the time and place of the public hearing were published in newspapers of general circulation and sometimes mailed to plaintiffs' counsel. These notices contain sufficient direct references to what was going to be considered at the hearings to do away with any reliance that plaintiffs may have had on the emission source condition and to give them opportunity to be prepared. Plaintiffs do not claim that they were denied the opportunity to argue on their behalf, to present evidence in support of their position or to be represented by counsel. It is a fact that they were represented by attorney Edelmiro Salas, their lawyer in this case, that they presented testimonial and documentary evidence and were given the opportunity to argue in favor of their position. They have not even charged that they were limited on these matters. The examining board acted correctly in holding the hearings that plaintiffs requested several months after the initial hearing since this allowed them additional time to gather the necessary technical evidence in support of their position. Plaintiffs also had available the remedy afforded by the laws of Puerto Rico—judicial review of the Board's decision before the Superior Court, *P.R.Laws Ann.*, Tit. 12, Sec. 1134(d).

Gelabert's decision to appoint an examining panel of engineers and lawyers unrelated to the agency and his subsequent decision not to participate in the BEQ's final vote, because he had been sued by plaintiffs rather than being proof of vitiated process, tends to show that plaintiffs were granted a fair process. The record also shows that the conclusions of the Examining Panel were not arbitrary nor unsupported by evidence. The weight the panel gave to the community's concern was justified and within its authority considering the statutory and constitutional interests the BEQ is required to protect. Perhaps if plaintiffs had concentrated their efforts in trying to convince the panel of adequate safety measures to deal with the Loíza community's concern instead of insisting on their obstinate attack on the BEQ's authority, the conclusions of the Board

would have been different. However, their claim before us is one of due process and considering the private interests which were allegedly injured by governmental intervention we understand that they erroneously led themselves to believe that the DNR permit that they had obtained granted them some concrete attribute of property. Even assuming that the DNR permit induced them to believe this, the procedures afforded were more than sufficient. We reach this conclusion following the criteria established by the Supreme Court in *Little v. Streater*, 452 U.S. 1, 8, 101 S.Ct. 2202, 2207, 68 L.Ed.2d 627 (1981) and in *Matthews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). The teaching of these cases is that the type of procedure required when a constitutionally protected interest is deprived depends on: (1) the private interests at stake; (2) the risk that the procedures used will lead to erroneous results and probable value of the suggested procedural safeguard; and, (3) the governmental interest affected. *Id.* In the instant case the extremely restricted and conditioned interest plaintiffs had, the hearings granted them and the importance of the governmental interest being protected convince us that the procedures were well within the constitutional parameters. Neither do we consider that the action of the BEQ was arbitrary, capricious or purposely discriminatory so as to violate traditional notions of fair play. See: *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); *Nebbia v. New York*, 291 U.S. 502, 4 S.Ct. 505, 78 L.Ed. 940 (1934). Having reviewed the facts of this case in light of our Circuit's recent analysis of a similar due process claim in *Creative Environments, Inc. v. Estabrook*, 680 F.2d 822 at 830 (1st Cir. 1982) we find that plaintiffs were afforded the "minimal process due them under the Constitution."

Having concluded that plaintiffs have failed to validly sustain their constitutional claim, there is no need to consider the claim of conspiracy to violate due process. Plaintiffs' assertions that the mayor of Loíza and members of its Municipal Assembly filed criminal charges on repeated occasions against them during December 1968 and January 1969 are mere allegations in support of a belated action for malicious prosecution that has not been alleged, except in a conclusory manner, to be connected with the actions of the BEQ in 1976–1978. Accordingly, plaintiffs' complaint is hereby DISMISSED.

SO ORDERED.