OPINION OF THE COURT
GARTH, Circuit Judge:
This case presents an issue of major importance under the Bankruptcy Reform Act of 1978: does 11 U.S.C. § 554 (1982) permit the abandonment of property of the bankrupt estate in contravention of state and local environmental protection laws? In proceedings before the bankruptcy court, the trustee in bankruptcy here asserted the power to abandon a waste oil processing and storage facility. He was opposed by the State and City of New York, who argued that the trustee’s power was limited by state and local laws regulating the abandonment of hazardous wastes. The bankruptcy court granted permission to abandon. The district court affirmed the bankruptcy court. We reverse.
I.
Quanta Resources Corp. (Quanta), which owned and operated a waste oil storage and processing facility in Long Island City, New York (the geographic center of New York City), filed a voluntary petition in bankruptcy under Chapter 11 of the Act on October 6, 1981. The action was converted to a liquidation proceeding under Chapter 7 on November 12, 1981. Thomas J. O’Neill (Trustee), the appellee here, was appointed trustee in bankruptcy on November 18, 1981.
The Trustee filed a notice of intention to abandon the facility under 11 U.S.C. § 554. That section provides that “[ajfter notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate, or that is of inconsequential value to the estate.” At the time of the notice there were on the site fuel storage tanks containing more than 500,000 gallons of waste oil and other chemicals, of which at least 70,000 gallons were contaminated with polychlorinated biphenyls (PCB’s).
PCB’s are extremely hazardous chemicals.[1] Reflecting the hazards associated with these compounds, numerous federal, state, and local laws govern the storage and disposal of PCB’s. E.g., 15 U.S.C. § 2605(e) (1982); 40 C.F.R. §§ 761.1-761.80 (1983); N.Y.Envtl.Conserv.Law §§ 27-0900 to 27-0923 (McKinney Supp.1982); N.Y.Admin.Code Tit. 6, § 366.4(e) (1982); New York, N.Y.Admin.Code § C19-50.0. Compliance with these laws would have required substantial expenditures to guard, repair, and clean up the facility and to dispose of the waste.[2] The Trustee’s notice *914 of intention to abandon was predicated on the assertions that the requisite expenditures would render the property a burden on the estate, and that the property would be of inconsequential or no value to the estate.'
At the time of proposed abandonment, the site was subject to two mortgage liens.[3] Although there were objections filed to abandonment, there was no dispute as to the. fact that the requisite expenditures would rapidly dissipate whatever equity there was in the property. Thus, the bankruptcy court found that the property was burdensome and of inconsequential or no value to the estate.[4]
The objections, to abandonment filed by New York asserted that abandonment of the property would itself violate state and local law. This is because “abandonment” under Section 554 revests title subject to liens in Quanta,[5] which has no other assets, having lost title to these in favor of the estate upon commencement of the bankruptcy case. 11 U.S.C. § 541 (1982). Quanta was itself, then, unable to act with respect to the site. Thus abandonment would, in effect, constitute disposal of the hazardous wastes, see N.Y.Envtl.Conserv.Law § 71-2702 (McKinney Supp.1982) (“disposal”). In addition, abandonment of the facility in its then state of disrepair, itself irremediable by Quanta, would create a continuing violation of state and local hazardous waste storage laws, see supra.
New York asserted, therefore, that because these laws are designed to decrease the risk of uncontrolled toxic chemical discharge, abandonment would create a substantial danger to the public health and safety. Thus New York requested that permission to abandon be denied until all hazardous wastes were removed from the property and lawfully disposed of. New York grounded its objection in both “public policy considerations” reflected in the applicable local laws and the provisions of 28 U.S.C. § 959(b) (1982), which requires that a trustee “manage and operate its property in his possession as such trustee ... according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.”
After a hearing, the bankruptcy court rejected New York’s objections and issued an order, on July 7, 1982, permitting abandonment. The court refused to stay the order pending appeal, and refused to grant New York a first lien on the property to the extent of any monies that New York might expend to bring the abandoned property into compliance with law. In fact, following the abandonment New York did proceed to clean up the facility,[6] with the exception of contaminated subsoil, at a cost of about $2.5 million (Affidavit of Richard Mendes).
New York appealed to the district court from the bankruptcy court’s order, without raising the question of New York’s right to a first lien. The district court affirmed on January 24, 1983. New York appealed to this court. The Commonwealth of Pennsylvania and the State of New Jersey sub *915 mitted briefs as amici curiae. The questions raised by New York in this appeal are the propriety vel non of abandonment, and New York’s right to reimbursement for its cleanup costs as an administrative expense, see 11 U.S.C. §§ 503(b), 507(a).
II.
Where it is contended, as it is here, that federal law confers a power that is not limitable by state law, the supremacy clause, U.S. Const. Art. VI, cl. 2, requires that we determine whether application of the state law frustrates the full effectuation of the objectives of federal bankruptcy legislation. Perez v. Campbell, 402 U.S. 637, 652, 91 S.Ct. 1704, 1712, 29 L.Ed.2d 233 (1971). In general, preemption of state law “is not favored ‘in the absence of persuasive reasons — either that the nature of the regulated subject matter permits no other conclusion, or that Congress has unmistakably so ordained.’ ” Consolidated Edison v. Montana, 453 U.S. 609, 634, 101 S.Ct. 2946, 2962, 69 L.Ed.2d 884 (1981) (quoting Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963)); see Penn Terra Ltd. v. Department of Envtl. Resources, 733 F.2d 267 at 272 (3d Cir. 1984). See also Stellwagen v. Clum, 245 U.S. 605, 613, 38 S.Ct. 215, 217, 62 L.Ed. 507 (1918) (state laws are suspended only to the extent of actual conflict with the scheme of federal regulation). Thus, analysis must proceed in two stages: first, an examination of the primary purposes of each of the laws at issue; second, a determination whether state law is an obstacle to the effectuation of federal objectives. Perez, supra, 402 U.S. at 644, 649, 91 S.Ct. at 1708-1711.
The objectives of federal bankruptcy law can be broadly stated: to provide for an equitable settling of creditors’ accounts by usurping from the debtor his power to control the distribution of his assets.[7] See Kothe v. R.C. Taylor Trust, 280 U.S. 224, 226, 50 S.Ct. 142, 143, 74 L.Ed. 382 (1930). The purpose of a liquidation proceeding under Chapter 7, as under Chapter 7 of the Bankruptcy Code, see S.Rep. No. 989, 95th Cong.2d.Sess. 6, reprinted in 1978 U.S.Code Cong. & Ad.News 5792 (new law essentially tracks previous law), is to provide a fair distribution of the debtor’s assets among the creditors; to that end, a trustee for the creditors is appointed by the court or elected by thq creditors. 11 U.S.C. §§ 702 (election), 703 (appointment), 704 (duties). The trustee must collect the debtor’s assets for the estate, reduce the assets to money, and distribute the property of the estate. Id. §§ 704, 726. The abandonment power embodied in Section 554 enables the trustee to rid the estate of burdensome or worthless assets, and so speeds the administration of the estate, see id. § 704(1); and also protects the estate from diminution. In such manner, abandonment serves the creditors’ interest in expeditiously obtaining a fair amount on settlement of their claims.
The primary purpose of the state and local laws regulating disposal of hazardous wastes is obviously to protect the public from the toxic effect of dangerous substances by preventing their uncontrolled discharge into the environment.
On the surface, these two purposes cannot be reconciled where the trustee legitimately invokes his power to abandon an asset whose manner of abandonment the state regulates. The question thus presents itself: did Congress intend that the trustee’s abandonment power be unrestricted by public health and safety regulations? Our examination of the bankruptcy *916 laws and the authorities interpreting these laws reveals no such congressional intent.
A.
We start with the basic assumption that Congress did not intend to displace state law. Maryland v. Louisiana, 451 U.S. 725, 746, 101 S.Ct. 2114, 2128, 68 L.Ed.2d 576 (1981); Penn Terra, supra, at 272. Where it is argued that Congress intended to withdraw police power from a state, that intention must be unmistakable. Penn Terra, supra, at 272-73.
There is no legislative history of Section 554. Although there had been no express recognition of an abandonment power in the pre-1978 bankruptcy statute, courts approved the trustee’s exercise of such a power as part of his larger power to dispose of the assets of the estate. See 4A Collier on Bankruptcy 1170.42 at 502-504 & n. 4 (J.W. Moore 14th ed. 1978) (citing cases); see also Bankruptcy Act, §§ 64a(4), 70a(2), 70b (1976) (repealed 1978) (provisions contemplating abandonment, respectively, of property against which taxes are assessed; of rights in pending applications for patents, copyrights, and trademarks; and of executory contracts). Section 554 obviously codifies this judge-made law.
Cases under pi;ior law held that “the trustee in the exercise of the power to abandon is subject to the application of general regulations of a police nature.” 4A Collier on Bankruptcy (14th ed.), supra, If 70.42[2] at 502-04. Ottenheimer v. Whitaker, 198 F.2d 289 (4th Cir.), affg 102 F.Supp. 913 (D.Md.1952), held that the trustee could not abandon four, worthless barges in a harbor, where abandonment would violate federal law relating to the obstruction of the harbor, even though the cost of complying with the laws would be much greater than the value of the barges. The court acknowledged the general rule that the trustee may abandon burdensome property, and then held it inapplicable.
This rule would be applicable here were it not for the unusual consequences that would follow. There can be no doubt that the property not only has no value, but also that the care and disposition of it will involve the expenditure of a substantial sum of money. But it is equally true that if the trustee abandons the barges and at the same time holds on to the valuable assets of the estate, the title to the barges will revert to the bankrupt and he will be left without means to care for or dispose of them in the manner prescribed by the statute.
In that event, the barges would sink and become an obstruction to the passage of other vessels, and it might well be held that the bankrupt or the trustee had become liable to the punishment of fine or imprisonment prescribed by the statute for the person who voluntarily or carelessly allows a vessel to be sunk in a navigable channel. It seems obvious to us that a rule which is not provided by statute but built up by the courts to facilitate the administration and distribution of the assets of a bankrupt estate should not be extended so as to reach such an unreasonable and unjust result. The judge-made rule must give way when it comes into conflict with a statute enacted in order to ensure the safety of navigation; for we are not dealing with a burden imposed upon the bankrupt or his property by contract, but a duty and a burden imposed upon an owner of vessels by an Act of Congress in the public interest.
198 F.2d at 290.
The concerns underlying this decision are, first, the comparative strengths of judge-made law relative to a conflicting statute, and second, the comparative strengths of policies which avoid burdens to the estate relative to the policies respecting safety of the public. With respect to each concern, the court held that the determinations of the legislature and the policy of safeguarding the public were paramount.
Another case, which relied in part on Ottenheimer and which emphasized a combination of these two concerns, is In re Lewis Jones, Inc., 1 Bankr.Ct.Dec. 277 (Bankr.E.D.Pa.1974). The court there held *917 that the trustee could not abandon underground steam pipes, vents, and manholes, where abandonment would infringe on the public interest by creating health and safety hazards. Lewis Jones cited the principle announced in S.E.C. v. United States Realty & Improvement Co., 310 U.S. 434, 455, 60 S.Ct. 1044, 1053, 84 L.Ed. 1293 (1940):
[A] bankruptcy court is a court of equity and is guided by equitable doctrines and principles except as they are inconsistent with the Act. A court of equity may in its discretion, in the exercise of the jurisdiction committed to it, grant or deny relief upon performance of a condition which will safeguard the public interest,
(citations omitted). The trustees in Lewis Jones estimated the cost of alleviating the problems to be at least $82,000 (plus $500 per vent to fill in each of an unknown number of vents); there were funds of $328,000 on hand; creditors’ claims amounted to $4,478,000. The court found that the cost was “not too high a price to pay in the public interest.” The court then ordered that permission to abandon be conditioned on the trustees’ expending funds to fill in and seal the steam openings.
In a case relying similarly on the court’s equitable powers, but grounding these in the jurisdiction conferred by statute, the court held that the trustees (in reorganization) for a railroad could not abandon service on a branch line even though operating the line would burden the estate with expenditures. In re Chicago Rapid Transit Co., 129 F.2d 1 (7th Cir.), cert. denied, 317 U.S. 683, 63 S.Ct. 205, 87 L.Ed. 547 (1942). In this case the railroad was a public utility, subject to state regulations that limited its power to abandon service without consent of the state authorities. The court first noted that under the supremacy clause, U.S. Const. Art. 6, cl. 2, the sole federal jurisdiction in bankruptcy, “when given expression in legislation by Congress,” supersedes all inconsistent state laws. Id. at 4. It then observed that the power to abandon burdensome assets was incidental to the powers lodged in the bankruptcy court by the statute, and that “the intent and purport of all bankruptcy legislation, so far as the power to protect the estate is concerned, is largely declaratory of certain recognized equitable principles, namely: the power of a court of equity to protect property in its custody.” 129 F.2d at 5. But, the court reasoned, if the traditional authority of the state to regulate local transportation should “be deemed withdrawn by Congress in bankruptcy legislation, evidence of that withdrawal in fit language should be found within the act.” Id., citing Palmer v. Massachusetts, 308 U.S. 79, 60 S.Ct. 34, 84 L.Ed. 93 (1939). It then held that Congress had not withdrawn the state’s authority, and thus the trustees must comply with the valid state laws. The court distinguished the bankruptcy court’s power to cancel burdensome leases, so that the trustees were permitted to cancel the lease of the line from the interstate authority, and were ordered to continue operating the railroad but for the account of the lessor.
By contrast, recently another court held, while citing Chicago Transit, that the trustee for a bankrupt hospital could not be prevented from abandoning medical records even though a state law required insolvent hospitals to maintain and store them. In re Adelphi Hospital Corp., Bankr.L.Rep. (CCH) 11 66,882 at 76,856 (2d Cir.1978) (per curiam). The Adelphi court relied on the supremacy clause, and stated simply:
It is beyond peradventuré that federal law prevails over inconsistent state laws. U.S. Const, art. VI, cl. 2; Gibbons v. Ogden, 22 U.S. (S Wheat.) 1, 6 L.Ed. 23 (1824). This fundamental principle of American jurisprudence of course encompasses the bankruptcy laws. U.S. Const, art. I. § 8, cl. 4; see, e.g., International Shoe Co. v. Pinkus, 278 U.S. 261, 263-65, 49 S.Ct. 108, 109-10, 73 L.Ed. 318 (1929). And under federal law, abandonment in this case is clearly permissible. See In re Chicago Rapid Transit Co., 129 F.2d 1, 4-5 (7th Cir.), cert. denied, 317 U.S. 683, 63 S.Ct. 205, 87 L.Ed. 547 (1942).
*918 The paramount purpose of bankruptcy liquidation and administration is the reduction of a bankrupt’s property to money as expeditiously as practicable, so as to secure funds for distribution to general creditors. Hence the trustee in examining the various assets with regard to their potential value when converted into money for distribution to creditors is from the outset faced with the managerial duty to concentrate on property of possible benefit to the estate and to eliminate property that will be either valueless or unprofitable in its administration ... The trustee ... may abandon any property which is either worthless, or overburdened, or for any other reason certain not to yield any benefit to the general estate. 4A Collier on Bankruptcy 1170.42, at 502 (14th ed. 1976) (footnotes omitted).
Id. at 76,857 (footnotes omitted). The court’s bare citation of Chicago Transit, which had reached an opposite conclusion, is not very helpful. But the passage it cites emphasizes that the state regulation at issue was a part of public utility regulation of a service operated for public convenience and necessity. Thus Adelphi may be read as distinguishing state regulations on the basis of their relative importance to the public of their intrusiveness in the regulation of the industry.
Ottenheimer and Chicago Transit have similar rationales, but Ottenheimer's stress in the judge-made character of the power to abandon is lacking in Chicago Transit. The two are consistent, however, in their reluctance to override state statutes in the absence of explicit Congressional direction: Ottenheimer's stress on the judge-made character of the power to abandon is comparable to Chicago Transit’s emphasis on the lack of explicit intent to override state utility regulations. A common concern may thus be found in all four noted cases: that where important state law or' general equitable principles protect some public interest, they should not be overridden by federal legislation unless they are inconsistent with explicit congressional intent such that the supremacy clause mandates their supersession by the abandonment power.
B.
Thus, whether the trustee’s power to abandon is limited depends in part on whether there is express federal law that either grants superseding power or subjugates the abandonment power to state law even if that law would otherwise be inconsistent. Section 554 itself refers only to the trustee’s affirmative power to abandon. Considered in the light of other provisions that both limit the supersession of state laws and specifically incorporate equitable principles into a bankruptcy court’s jurisdiction, it is clear that Section 554 does not of itself preempt state police power regulations.
That Congress did not intend the bankruptcy scheme generally to abrogate the enforcement of state police power regulations is evidenced by, first, the express exception to the automatic stay otherwise imposed on all actions against the debtor, 11 U.S.C. § 362(a), for “the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit’s police or regulatory power.” Id. § 362(b)(4). The exception applies “where a governmental unit is suing a debtor to prevent or stop violation of ... environmental protection ... laws, or attempting to fix damages for violation of such a law.” S.Rep. No. 989, 95th Cong., 2d Sess. 52, reprinted in 1978 U.S.Code Cong. & Ad.News 5838. See Penn Terra, supra, at 274-78 (injunction to enforce compliance with state environmental protection laws is not money judgment, is not subject to § 362 stay); Commonwealth v. Peggs Run Coal Co., 55 Pa.Cmwlth. 312, 423 A.2d 765 (1980) (same); cf. In re Canarico Quarries, Inc., 466 F.Supp. 1333, 1339-40 (D.P.R.1979) (case under old law using new § 362(b)(4) as persuasive' authority to hold not stayed a proceeding to enforce compliance with Federal Clean Air Act, 42 U.S.C. § 7401-7642 (1976)). See also In re Kovacs, 681 F.2d 454, 456 (6th Cir.1982) (discussed in Penn Terra, supra, *919 at 277 n. 11), vacated and remanded on other grounds, 459 U.S. 1167, 103 S.Ct. 810, 74 L.Ed.2d 1010 (1983), on remand sub nom. Ohio v. Kovacs, 717 F.2d 985 (6th Cir.1983), cert. granted, — U.S.-, 104 S.Ct. 1438, 79 L.Ed.2d 759 (1984).
A second indication that the bankruptcy scheme is not intended to abrogate relevant state laws is found in 28 U.S.C. § 959(b) (1982):
(b) Except as provided in section 1166, a trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.
The trustee in this case argues that Section 959(b) is inapplicable outside a chapter 11 proceeding (Br. at 12), where the trustee is managing the debtor’s business, see 11 U.S.C. § 1108 (1982). Even in a chapter 7 proceeding, however, the trustee may be authorized to operate a business. Id. § 721. Thus there is no reason to suppose Section 959(b) inapplicable in chapter 7.
Implicit in Section 959(b) is the notion that the goals of the federal bankruptcy laws, including rehabilitation of the debtor, do not authorize transgression of state laws setting requirements for the operation of the business even if the continued operation of the business would be thwarted by applying state laws. See Gillis v. California, 293 U.S. 62, 55 S.Ct. 4, 79 L.Ed. 199 (1934); In re Dolly Madison Indus., 504 F.2d 499 (3d Cir.1974); In re Canarico Quarries, Inc., 466 F.Supp. 1333 (D.P.R. 1979). New York argues that this principle extends to the liquidation process, contending that the goal of the federal bankruptcy law here — distribution of the assets to creditors — does not authorize transgression of state laws setting requirements for disposal of assets.
Our examination of Section 959(b) leads us to conclude that although it is not itself an independent prohibition of the trustee’s abandoning property in contravention of state law, it is a- clear indication that in general the congressional scheme was not intended to subjugate state and local regulatory laws. As a matter of simple statutory construction, the applicability of Section 959(b) would seem open to question. The provision speaks in terms of “manage[ment]” and operation] of the “property.” It would not strain- the language to construe “management of the property” to include abandonment of a facility. Nor would it be a gross misreading to construe “manage and operate” narrowly, to mean only the administration of the business as a going concern. Again, we have found no legislative history.
Section 959(b) refers to’ the railroad reorganization provisions of the Bankruptcy Act; these permit the court to authorize abandonment of a line if it is consistent with the • public interest. 11 U.S.C. § 1170(a). But since railroad reorganization is treated as sui generis within the Act, see 11 U.S.C. § 1161, this reference is of little relevance to the inquiry except as it indicates that state laws are not applicable to abandonment of a railroad line (although the extent of their applicability in determining the public interest is not indicated).
The trustee cites two authorities for support of a narrow construction of the provision. One is a footnote in Missouri v. United States Bankruptcy Court, 647 F.2d 768, 778 n. 18 (8th Cir.1981), in which the court stated, in dictum and without analysis, its “doubt” that a Chapter XI trustee for a grain elevator would be prohibited from selling grain in the exercise of his power to liquidate assets even though state law required a license to sell grain. By contrast the trustee would, by Section 959(b), be required to obtain a state license to operate the grain warehouses. Id. at 778. This ease would seem to be authority for a distinction between operation of a business and liquidation of its assets. There was, however, no showing that failure to comply with the state law in ques *920 tion would in any way affect the public health, safety, or welfare, in contrast to the case here. Would the 8th Circuit have so readily dismissed the issue if the trustee had been selling spoiled grain, in contravention of state law? Its terse statement is devoid of analysis and is therefore of little help to the trustee’s cause here.
The trustee also relies, as did the court below, on a statement in a treatise:
But § 959(b) applies only to the receiver in his operation of the property in his possession. It does not require the federal receivership court to comply with state laws regulating the distribution of funds in receivership, although Erie R. Co. v. Tompkins should now require it to do so in cases involving only non-federal matters.
7-pt 2 Moore’s Federal Practice, H 66.04[4] at 1913 (J. Moore & J. Lucas 2d ed. 1982) (footnotes omitted). This paragraph is authority for a basic distinction between distribution of funds in liquidation and operation of a business. Again, though, its reach is limited. Clearly state law regulating the distribution of assets among creditors must give way to the all-encompassing federal law of creditors’ rights. American Surety Co. v. Sampsell, 327 U.S. 269, 272, 66 S.Ct. 571, 573, 90 L.Ed. 663.(1946). It does not follow that state police power regulations must also give way.
Chicago Transit, supra, 129 F.2d at 6, noted that prohibiting abandonment in that case while permitting the trustee to cancel the lease would not violate the predecessor to Section 959(b), 28 U.S.C. § 124 (1940), which required that federal receivers operate trust property in accordance with the laws of the state as the owner would be bound to do. There would be no violation because the trustee was ordered to comply with state law to the extent it required service to be continued; but the state’s authority could not be extended to the protection of existing contracts, rather these could be abrogated by the court in its exercise of equitable powers.
Chicago Transit, however, is not precisely on point here: the state law required operation of the business, whereas New York law here only limits abandonment (disposal) of the facilities and does not speak to operation of the business. Thus the Chicago Transit case does not answer the inquiry whether Section 959(b) applies outside of the operation of a business (or maintenance of its assets in anticipation of such). But it would be an overly literal reading that would dismiss wholly the import of the provision on the ground that “abandonment” of property is distinguishable from “management” of property. The interests at stake are not so different; in each case the creditors have an interest in preserving the debtor’s estate so as to maximize their proportionate recovery; indeed, when the debtor’s business is managed on a chapter 11 proceeding, there is another interest to be considered, the debtor’s interest in rehabilitating the business as a going concern. Thus, since courts have been willing to find Section 959(b) applicable even if these two interests are thwarted, a fortiori it is not inapplicable just because one interest is adversely affected.
Thus, at the very least, the existence of Section 959(b) indicates that Congress has not “unmistakably ordained” that state law is 'superseded by the trustee’s powers to administer the property of the estate.
The third, and final, consideration that informs our decision is the provision in the bankruptcy act for the application of equitable principles to determine the efficacy of requested relief. In addition to the powers given to the court in 11 U.S.C. § 105 to “issue any order, process, or judgment that is necessary or appropriate to carry out the provisions” of the Act, 28 U.S.C. § 1481 establishes the jurisdiction of the court to include all the powers of a court of equity.[8] Under the old bankruptcy statute, under *921 which bankruptcy courts had been given “such jurisdiction at law and equity as will enable them to exercise original jurisdiction,” 11 U.S.C. § 2 (1976) (repealed) it was held that bankruptcy courts are courts of equity and may apply equitable doctrines and principles insofar as they are consistent with the statute. SEC v. United States Realty Co., supra, 310 U.S. at 455, 60 S.Ct. at 1053; Pepper v. Litton, 308 U.S. 295, 304-05, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939).
This same proposition has been held applicable to the 1978 Act: “[Bankruptcy courts are courts of equity, but at the same time, authorized to prevent courses of conduct otherwise fraudulent, abusive or unfair.” In re Multiponics, Inc., 622 F.2d 709, 721 (5th Cir.1980) (citations omitted, but citing Pepper v. Litton, supra).
Thus, since there is no unmistakable evidence of congressional intent to abrogate the enforcement of state environmental protection laws — rather, there is evidence of an intent to accommodate such laws— and since equitable principles must be applied, federal law is supreme only if those principles demand that state police powers be suspended to the extent they interfere with the liquidation of the estate.
C.
The cases discussed supra that stand for the proposition that equitable principles are applicable in determining whether a trustee may abandon property in contravention of state law require that a court balance the relative weight of the state and federal policies. In this case, the state and local regulations advance a very important policy: to protect the public health by regulating disposal of toxic wastes. Abandonment by the trustee clearly contravened applicable law, and did so not merely technically, but with severely deleterious implications for the public safety. The great weight thus attaching to the state’s interest makes this case more akin to those of Ottenheimer v. Whitaker, supra, and In re Lewis Jones, supra, than it is to In re Adelphi Hospital. The weight of state law is reflected also in the fact that (as in Ottenheimer) violation of the disposal regulations may constitute a felony. See N.Y.Envtl.Conserv.Law § 71-2721 (McKinney Supp.1982).
To be weighed against this manifestly important public policy is the policy advanced by abandonment, to preserve as much of the estate as possible for distribution to creditors. This policy must be viewed in light of the indications of a concurrent federal legislative policy to limit intrusion into state police power regulations, including environmental protection laws, delineated supra. Here, it is undisputed that compliance with hazardous waste disposal laws required substantial expenditures, thus depleting the assets of the estate available for distribution to creditors.
But the extent (unproven in these proceedings) [9] of the expenditures necessary to dispose of the waste properly is not in itself sufficient to outweigh the public interest at stake here. It is only recently that the public has learned of the magnitude of the dangers associated with toxic waste disposal; at the same time, the last few years have witnessed a rising tide of bankruptcies. Lurking in the shadows of these phenomena is the spectre of the changing fortunes of the nuclear power industry, with the concomitant potentiality for unusable facilities. If trustees in bankruptcy are to be permitted to dispose of hazardous wastes under the cloak of . the abandonment power, compliance with environmental protection laws will be transformed into governmental cleanup by default. It cannot be said that the bankruptcy laws were intended to work such a radical change in the nature of local public health and safety regulation — the substitu *922 tion of governmental action for citizen compliance — without an indication that Congress so intended.[10] The supremacy clause does not require the suspension of the operation of New York’s hazardous waste disposal laws.[11]
III.
New York requests that it be reimbursed, out of the assets of the estate, for its cleanup costs as an “administration expense,” see 11 U.S.C. §§ 503(b) & 507(a).
Section 503(b) lists several categories of allowable -administrative expenses. The categories are not exclusive: administrative expenses “including” those listed are allowed, and “including” is not exclusive, 11 U.S.C. § 102(3). The only relevant category of those listed would seem to be Sec *923 tion 503(b)(1)(A), “actual, necessary costs of preserving the estate.” Preservation includes the costs of custodial care or insurance, see 3 Collier on Bankruptcy (L. King 15th ed. 1983), supra, 11 503.04 at 503-16, and necessary repairs, id. We need not, however, reach the issue of the priority, if any, of New York’s claim. That is an issue that can properly be resolved only by the bankruptcy court, since the issue was not treated in the proceedings below and so the record on appeal does not include findings of relevant fact.
IV.
The order of the district court dated January 25, 1983, which affirmed the order of abandonment will be reversed, and the case remanded for proceedings consistent with this opinion.
Each party will bear its own costs.

. PCB's are themselves toxic. See generally Nat’I. Rsch. Council Comm’ee on the Assessment of Polychlorinated Biphenyls in the Environment, Polychlorinated Biphenyls (1979). Their oxidation products (produced upon burning PCB’s) are also toxic. Among the oxidation products of PCB’s are polychlorinated dibenzop-dioxins (the so-called “dioxins”) and polychlorinated dibenzo forans, which are powerful carcinogens, teratogens, and liver toxins. Affidavit of Dan Levy, New York State Department of Law Environmental Scientist, App. 19-22.

. At the time of the hearing, Quanta was evidently in violation of a consent order requiring it to bring the facility into compliance with state law. See Transcript of Bankruptcy Proceedings, June 8, 1982, at 25.

. On March 18, 1982, .the Trustee had filed a notice of intended "sale by public auction as abandonment" of the site. The notice stated that if the Trustee did not receive an offer in excess of a lien of the Equitable Life Assurance Society, the property would be abandoned. Objection to the sale was filed by Portland Holding Corp. based on an asserted mortgage lien; the bankruptcy court entered judgment establishing the validity of that lien. An offer to purchase the property subject to the liens was approved by the court, but was subsequently withdrawn on the ground that there were hazardous wastes stored there in violation of law, and that this had not been made known to the purchaser. See Transcript of Bankruptcy Court Proceedings, June 8, 1982, at 12. These liens were later abandoned. See Affidavit of Nancy Stearns, annex; Affidavit of Carol Moore, Exh. B.

. This factual finding is not challenged on appeal.

. Abandonment is to any person with a possessory interest in the property, including the debt- or, See S.Rep. No. 989, 95th Cong., 2d Sess. 93 (1978), reprinted in 1978 U.S.Code Cong. & Ad. News 5787, 5878.

. See N.Y.Envtl.Conserv.Law § 27-0916 (McKinney Supp.1982).

. While it has been held that the old bankruptcy law advanced a second purpose, to provide a fresh start for the debtor, e.g., Kokoszka v. Belford, 417 U.S. 642, 645-46, 94 S.Ct. 2431, 2433-34, 41 L.Ed.2d 374 (1974) (citing Berlingham v. Crouse, 228 U.S. 459, 473; 33 S.Ct. 564, 568, 57 L.Ed. 920 (1913)), that purpose can no longer be said to be advanced in present liquidation law, with respect to nonindividuals (i.e., corporations and partnerships), since the 1978 Act eliminated the provision for discharge of debts of nonindividuals. 11 U.S.C. § 727(a)(1); see S.Rep. No. 989, 95th Cong. 2d Sess. 98 (1978), reprinted in 1978 U.S.Code Cong. & Ad.News 5884.

. Section 1481 did not technically become effective until April 1, 1984, but transition provisions of the Bankruptcy Reform Act vest courts with the same authority they would have as of that date. See Pub.L. No. 598, 95th Cong., 2d sess. § 405(b) (1978); Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 100 n. 2 (3d Cir. 1981).

. The issue of the exact amount of the depletion was never brought before the bankruptcy court, or the district court. The Trustee alleged that the property itself had a fair market value of $535,000, and a forced sale value of $428,000, both at the time subject to mortgages in excess of $450,000. Tr. of June 8, 1982 Bankruptcy Hearing at 2. But this does not relate the expense to the size of the debtor’s estate. The Trustee did note that at the time he was unable to liquidate some major assets (such as oil). Id. at 11-12.

. Indeed, Congress has elsewhere indicated an intent that governmental units be reimbursed, by those responsible for storage, transport, and disposal of hazardous wastes, for government’s costs of emergency cleanup of inactive hazardous waste sites by creating a federal cause of action for reimbursement. Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9607 (Supp. V 1981) ("superfund" legislation); one objective of imposing liability was “to induce such [liable] persons voluntarily to pursue appropriate environmental response actions with respect to inactive hazardous waste sites.” H.Rep. No. 1016, Pt. I, 96th Cong. 2d Sess. 17 (1980), reprinted in 1980 U.S.Code Cong. & Ad.News 6119, 6120 (emphasis added).

. As support for its basic position that the abandonment power is not limited by state law, and not as a separate or discrete issue.or independent bar to the enforcement of state law, the Trustee contends that prohibiting abandonment may effect an unconstitutional taking under the Fifth Amendment. The Trustee argues that use of the estate’s assets to comply with state law may deplete the estate to such an extent that the secured creditors will receive less in satisfaction of their claims than they otherwise would have.
The rights of a secured creditor in the debtor's assets are “property” subject to a "taking.” See United States v. Security Indus. Bank, 459 U.S. 70, 103 S.Ct. 407, 411, 74 L.Ed.2d 235 (1982). But we are not persuaded by the Trustee’s argument that an unconstitutional taking could result from forbidding abandonment here. First, the state’s enforcement of its environmental protection laws cannot be characterized as a taking; rather it is a permissible exercise of the state’s regulatory power to promote the public good, under a long line of cases dealing with just that distinction. E.g., Agins v. City of Tiburon, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980) (municipal zoning ordinances restricting type and density of buildings held not a taking); Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (landmark preservation ordinance); Goldblatt v. Hempstead, 369 U.S. 590 (1962) (town ordinance prohibiting use of land for mining); Miller v. Schoene, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928) (statute requiring landowner to destroy diseased cedar trees); Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (industrial zoning regulation); Hadecheck v. Sebastian, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (municipal ordinance prohibiting brickmaking); Mugler v. Kansas, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887) (state statute declaring places of manufacture of liquor to be nuisances); Troy v. Renna, 111 F.2d 287 (3d Cir.1984) (state statute creating statutory tenancies for senior citizens and disabled persons). See generally Michel-man, Property, Utility, and Fairness: Comments on the Ethical Foundations of “Just Compensation” Law, 80 Harv.L.Rev. 1165, 1183-84 (1967) (factors relevant to classifying an action as regulation or taking).
Second, the Trustee contends that this case presents the possibility of an "erosion taking,” citing to the Regional Reorganization Act Cases, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), and In re New York, N.H. & H.R.R., 330 F.Supp. 131, 147 (D.Conn.1971), rev'd on other grounds, 457 F.2d 683 (2d Cir.1972) (lack of subject matter jurisdiction); see also New Haven Inclusion Cases, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970). The doctrine in those cases, even if deemed to be applicable here (and we have serious doubts that it would be applicable, because of the sui generis nature of the subject matter, railroad reorganization) would require a balancing of the losses to the estate against the public interest. Whether an erosion taking will result would depend under this theory on whether forcing expenditure of assets by preventing abandonment will cause "losses unreasonable even in light of the public interest.” Regional Railroad Reorganization Act Cases, supra, 419 U.S. at 124, 95 S.Ct. at 349 (taking by accrual of post-bankruptcy claims with priority over those of claimants). We cannot say that the public interest would be outweighed by losses here. Our prior analysis applies with equal force here in determining whether it is constitutionally “unreasonable” to require that the estate’s assets be expended to comply with toxic waste disposal law as a condition of abandonment. Cf. City of Paterson v. Fargo Realty, Inc., 174 N.J.Super. 178, 415 A.2d 1210 (1980) (not unconstitutional to require owner to reimburse city for expenses incurred in razing structure that was public nuisance).